Affirming.
Appellant, Kentucky Association of Highway Contractors, was incorporated under section 879, Kentucky Statutes. It has no capital stock and was not organized for the purpose of engaging in business for gain. It comes directly within the terms of the statute providing for the organization of such corporations "from which no private pecuniary profit is to be derived." The articles of incorporation that gave it existence were executed on the 8th of February, 1921, and they provide: "The nature of the business, objects and purposes proposed to be transacted, promoted and carried on is that of promoting better relations between the State Highway Commission, its engineers and inspectors, and fiscal courts on the one hand and contractors on the other hand; to maintain a high standard of contracting work; to combat unfair practices; to encourage efficiency among contractors; to support contractors in efforts to rectify conditions of an unsatisfactory character; to encourage those methods of contracting work which relieve the contractor of improper risks; to encourage sound business methods tending to raise the standing of contractors in the business world and to assist the state of Kentucky in building a comprehensive system of roads throughout the state."
The by-laws provide for the reception of members into the association, etc., and one of them says that: "The annual dues shall be fifty dollars, payable in advance. In addition to the above, a fee of 1/4 of one per cent on all federal, state and county highway work in the state of Kentucky, contracted for by members of this association, shall be paid into this association. This fee is to be due when contract for work is awarded and to be paid out of first estimate. If a member fails to pay dues or fees after a reasonable length of time he may be dropped from the association at the discretion of the executive board." *Page 169 
A short time after the organization of the association appellee Williams applied to it for membership and, being admitted, paid his dues as fixed by the by-laws of the order above quoted. For the balance of the year 1921 appellee was in good standing in the association. During that time he was awarded by the State Highway Commission three road contracts, one for $222,067.00, another for $85,765.00, and a third for $114,469.00. His fees due the association, according to the above inserted by-law, were respectively $286.17, $214.41 and $555.17, upon the contracts. He paid it $286.17 in satisfaction of the fees upon one of the contracts but declined to pay the other fees due, and this suit was commenced by the association against him to recover the two unpaid sums, $555.17 and $214.41.
Among the defenses relied on defendant affirmatively pleaded: "Further answering the defendant states that at the time he became a member of the plaintiff organization, he believed in good faith that the said corporation was a legal and valid organization and was not apprized of the fact that it was an organization, the purpose of which was to control the business of constructing highways in the state of Kentucky, and he states that to the extent that it imposed an exaction of one-fourth of one per cent, upon all contracts entered into by the members of said organization, it was a restraint upon competition, illegal in character and against the public policy of the state of Kentucky and of the acts of Congress in such cases made and provided, and especially what is known as the Sherman Anti-Trust Act." It will thus be seen that the pleader averred and relied on the illegality of that part of the by-law of plaintiff entitling it to collect as dues from its members a stipulated per cent of the amount of all public contracts obtained by such member, upon the ground that such portion of the bylaw was against public policy and void; although it was added, "And especially what is known as the Sherman Anti-Trust Act," and although it was also further pleaded that the objects and purposes of plaintiff in its organization were themselves illegal.
An amended answer alleged that defendant in the public contracts he obtained after becoming a member of the corporate plaintiff added to his bid the per centum it is herein sought to be recovered, and in his deposition he also testified to that fact. Plaintiff introduced its *Page 170 
president and secretary, and the substance of their testimony was that the objects and purposes of the organization were to improve the work of contractors; to bring about a more efficient relationship between them, and the public, and to make their work more efficient and, in short, that such objects and purposes were in every way laudable and absolutely free from any interference with competition. They also testified to the amount of annual income of the corporation arising from the percentage source of dues under the by-law as well as all of its other income, and the purposes for which it was expended; but none of which, according to our view, as will hereinafter be shown, had any relevancy to the question involved. The case was submitted to the court without the intervention of a jury and plaintiff's petition was dismissed upon the ground that the by-law demanding dues based upon a percentage of the contract price was against public policy and void, and to reverse that judgment plaintiff prosecutes this appeal.
Learned counsel for appellant argue that if the object and purposes of plaintiff in its organization were lawful, and the percentage fee it exacted was reasonable, then no principle of public policy is involved and that the court erred in dismissing the petition, and in their brief they say: "Now if the association is a lawful one, and the fee a reasonable one, there can be but one single ground left on which the right of Williams to defeat this case can be put, and that is that Williams added to his bid the amount of dues and fees that he agreed to pay the association." If we should accept that statement as a correct principle of law, it would then seem to necessarily follow that plaintiff should not recover in this case, since defendant testified positively that he made such addition to his bids and it is denied by no one. However, counsel attempts to meet that situation by the further argument that such additions made by Williams, if true, were done by himself upon his own initiative and not with the knowledge and consent of the association, and that being true, as contended, it is then claimed that the right of the association can not be affected by the wrong committed by Williams, and cases are cited to the effect that a wrong done by one party to a contract without the knowledge, consent or acquiscence of the other one can not affect the latter's rights thereunder, and which, as a general proposition, is true in all contracts where no question of public policy is involved. But, where the contract in its *Page 171 
very nature and tendency is such as is forbidden as against public policy, it is then ipso facto void and neither party can maintain an action upon it regardless of what the other may or may not have done under it. So that, the question in this ease is: Whether an agreement by defendant to pay and plaintiff to receive a percentage of the price of all such public contracts is inherently vicious as being against public policy? In the determination of that question we will eliminate from our consideration all questions as to the legality of the purposes for which the association was organized, and, of course, will not take into consideration the fact that it knew or did not know of Williams adding the percentage dues to his contract; nor is it necessary to consider the fact that he did or did not make such additions, since the question for determination, as we will also see, is not affected by that fact.
In stating the law with reference to public policy questions involved in contracts, and when parties are forbidden to enter into them where they have a direct tendency to injuriously affect the public welfare, and are consequently against public policy, the text in 9 Cyc. 481 says: "If an agreement binds the parties or either of them, or if the consideration is, to do something opposed to the public policy of the state or nation, it is illegal and absolutely void, however solemnly made. If a court should enforce such agreements it would employ its functions in undoing what it was created to do. It is not easy to give a precise definition of public policy. It is perhaps correct to say that public policy is that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against the public good, which may be designated, as it sometimes has been, the policy of the law or public policy in relation to the administration of the law. Where a contract belongs to this class, it will be declared void, although in the particular instance no injury to the public may have resulted. In other words its validity is determined by its general tendency at thetime it is made, and if this is opposed to the interests of thepublic it will be invalid, even though the intent of the parties was good and no injury to the public would result in the particular case. The test is the evil tendency of the contract and not its actual injury to the public in a particular instance." (Our italics). Greenwood on Public Policy, page 179; Williston on Contracts, volume 3, sections *Page 172 
1728a, 1760 and 1761; 13 C. J. 424-425, and all other text writers state the general rule to be the same as contained in the excerpt from Cyc., and it would serve no useful purpose to incorporate herein any portions of those texts. In accord therewith are all of the courts of the union, including this one. Some of the many opinions written by this court announcing the general principles as contained in the excerpt are: Ballard County Bank's Assignee v. U.S. Fidelity and Guaranty Company,150 Ky. 236; Gordon v. Gordon's Administrator, 168 Ky. 402; City of Princeton v. Princeton Electric Light and Power Company, 166 Ky. 730; Westerfield-Bonte Co. v. Burnett, 176 Ky. 188; Owens v. Henderson Brewing Company, 185 Ky. 477; P. C. C. St. L. R. R. Co. v. Carmody, 188 Ky. 588; Town of Nortonville v. Woodward, 191 Ky. 730, and Workmen's Compensation Board v. Abbott, 212 Ky. 123. It will be seen that the prohibited contracts, upon the ground that they are against public policy, are those which have "A tendency to be injurious to the public or against the public good," and that their validity is determined by their general tendency at the time they are made, and if such tendency is opposed to the interest of the public the contract will be invalid "Even though the intent of the parties was good, and no injury to the public would result in the particular case. The test is the evil tendeney of the contract and not its actual injury to the public in a particular instance." (Our italics).
It could serve no useful purpose to cite the multiplicity of cases where contracts have been declared illegal because their direct tendency was injurious to the public interests. They include contracts to affect legislation; influence the action of a public officer; to disturb or injuriously affect the marital relation; tending to stifle competition, especially in matters relating to contracts for public works (13 C. J. 436), and a vast number of others. So that, each case must depend upon its own facts and circumstances and, necessarily, where the precise question has not been determined analogous cases involving the same general principle may be looked to by the courts in arriving at a satisfactory conclusion. However, in this case, although we have been unable to find where the exact question has been determined by any court, it would seem that under the general definition of the principle of law involved the contract here sought to be enforced has none other than a direct evil tendency, and to be injurious to the public good, and for *Page 173 
that reason it should not be enforced regardless of the lawful intent of the parties in making it, and also regardless of the further fact that the public may not have been injured in the particular instance.
Human nature is a thing of which courts will take judicial knowledge, and a part of it is to protect one's self from expenses and financial burdens, as much so as possible, and to shift or avoid them whenever an opportunity exists. The contract here involved directly creates that opportunity,i. e., it creates a stimulus on the part of the member contractor to add to his bid on all public contracts the amount that the association's contract with him forces him to pay to it, and to thereby recoup that amount, for his own protection, from the public authority letting the contract. The contract sued on can have no other tendency, since it is a direct levy by plaintiff of a tax on the contract price of its members made with the public and to be paid out of public funds, and the purpose which it tends to accomplish with that tax after it is collected has nothing whatever to do with the question.
But, it may be argued that it is lawful for contractors to organize themselves for legitimate purposes and to collect dues from the members of such organization for the purpose of maintaining and supporting it, and that if the dues here involved are against public policy then any that might be devised would likewise be so; but such is not true, since the collection of dues from a member regardless of whether he obtains contracts is in no sense a direct tax upon, or the levying of a tribute on the price of his contracts. In the supposed case he pays his dues out of any money that he might possess regardless of the fact as to whether he may ever become a successful bidder, and such a method has in no sense adirect tendency to injuriously affect the public good. At most, it could only remotely do so, thereby presenting a case not coming within the "public policy" rule and, consequently, a contract not forbidden by the law.
An analogous question was presented to this court in the cases of Fields v. Chipley, 79 Ky. 260; Holt v. Thurmond,111 Ky. 84, and Town of Nortonville v. Woodward, supra. The question involved in the Fields case was the right of a public officer to assign the whole or a part of his unearned future salary; while in the Woodward case the question was the validity of a contract to serve the public for less than the fixed salary. In both cases the contracts were held invalid as against public *Page 174 
policy. In the first one of those cases the assignment of the unearned salary would create an incentive on the part of the officer to neglect his duties and the public would thereby be injuriously affected. If the public would be so affected through the tendency produced by the contract there involved afortiori, would it be so injuriously affected by the tendency created by the contract here involved, since its inevitable effect is to cause the contractor to recoup his dues by adding them to the amount of his bid; and it might be further suggested that in doing so he would thereby reduce his ability to compete on equal terms with nonmembers of the association who had no such burden to take care of.
Without further elaboration it is our conclusion that the contract here involved is unmistakably against public policy and the court did not err in so adjudging.
Wherefore, the petition for rehearing is granted, the former opinion is withdrawn, and the judgment is affirmed.
Whole court sitting.