L. A. Andrew, State Superintendent of Banking, Appellant, v. J. A. Breon et al., Appellees.

No. 39578.

June 24, 1929.

*John Fletcher,* Attorney-general, *George B. Baker, Clyde E. Jones,* and *Jo R. Jaques,* for appellant.

*F. M. Beatty, McCoy & McCoy,* and *Gillies & Daugherty,* for appellees.

Kindig, J.—For many years, the Hedrick State Bank, an Iowa banking corporation with a capital of $25,000, conducted business at Hedrick. In November, 1921, its charter expired. An application, in due time, was made by the stockholders of the corporation to the state banking superintendent for the renewal thereof. Before granting the request, the state superintendent, through a bank examiner, investigated the affairs of that financial concern. Through this examination, it was learned that certain

of the bank's assets were of doubtful character. So the state superintendent of banking questioned the institution's solvency. Then, on January 31, 1922, a written agreement was entered into between the state superintendent of banking and the appellees J. A. Breon, L. L. Bowlin, C. J. Martin, Fred Sauer, and J. P. Holzhauser, who were the bank's officers and directors. Said written undertaking, so far as material, is to the following effect:

"* * * Whereas, the superintendent of banking of the state of Iowa, W. J. Murray, has reached the conclusion that certain assets of said bank [Hedrick State Bank] are of doubtful character, and its solvency is questioned by said superintendent of banking. * * *

"Now, therefore, be it remembered, that the undersigned [appellees] members of the board of directors and officers and stockholders of the Hedrick State Bank, and each of them, in consideration of said banking department permitting the said Hedrick State Bank to continue in business and receive further deposits and continue to conduct the banking business, guarantee that said Hedrick State Bank is at this time solvent; they and each of them further contract and agree to keep and maintain said Hedrick State Bank solvent.

"They further contract and agree to collect or otherwise convert the assets of said bank, including the notes, bills, contracts, and other evidences of indebtedness belonging to said institution, into cash or to have the same secured in due course of business to the satisfaction of the superintendent of banking of the state of Iowa, W. J. Murray. * * *"

Subsequently, in February, 1922, the bank's charter was renewed, and thereunder the institution was permitted to, and did, operate until February 1, 1926, when it was closed by the banking department for insolvency. On February 9th thereafter, the appellant was duly appointed receiver for the financial concern, as by law provided. More than a year after assuming this trust, the appellant, on March 30, 1927, filed his petition in this action, seeking to recover from the appellees $175,000.

That pleading was divided into three counts: Count I was predicated upon the written contract of guaranty before mentioned; Count II was founded upon the common-law liability of bank directors for negligence in loaning the bank's funds; and

Count III was based upon the directors' liability for making excess loans. II and III of the above counts are not involved in the present appeal, but only that regarding the written contract of guaranty is before us.

This Count I was attacked by appellees through a demurrer. As far as material, the demurrer questioned the sufficiency of said Count I to entitle appellant to the relief demanded, because: First, said contract is too indefinite, vague, and uncertain; second, the contract is contrary to public policy, and therefore void; and third, there is no consideration to support the agreement.

Is the contract aforesaid, between the state banking superintendent and the officers and directors of the bank, void because contrary to public policy? A discussion of the law applicable and a more thorough examination of the specific facts here concerned will make possible an answer to the interrogatory. What is public policy? Our own court, in *Liggett v. Shriver*, 181 Iowa 260, said, upon this subject:

"The term 'public policy' is of indefinite and uncertain definition, and there is no absolute rule or test by which it can be always determined whether a contract contravenes the public policy of the state; but each case must be determined according to the terms of the instrument under consideration and the circumstances peculiar thereto. In general, however, it may be said that any contract which conflicts with the morals of the times or contravenes any established interest of society is contrary to public policy. We must look to the Constitution, statutes, and judicial decisions of the state, to determine its public policy; and that which is not prohibited by statute, condemned by judicial decision, nor contrary to the public morals contravenes no principle of public policy."

13 Corpus Juris 426, Section 362, furnishes the following text:

"But there are many things which the law does not expressly prohibit or penalize which are so mischievous in their nature and tendency that, on grounds of public policy, they are not permitted to be the subject of an enforceable agreement."

See, also, *Blair v. Fitch*, 189 Iowa 1307; *Wilson Subdrainage Dist. v. Richardson*, 195 Iowa 345.

With those definitions as a guide, we now proceed to test the legality of the contract before us by measuring it against the legal duties imposed upon the state banking superintendent. Section 9140 of the 1924 Code provides:

"The superintendent of banking shall be the head of the banking department of Iowa and shall have general control, supervision, and direction of all banks and trust companies incorporated under the laws of Iowa, and shall be charged with the execution of the laws of this state relating to banks and banking. The organization and reorganization of state and savings banks and trust companies shall be subject to the approval of the superintendent of banking."

9235 of the same Code contains this command:

"When it shall appear to the superintendent of banking that any savings or state bank has refused to pay its deposits in accordance with the terms on which such deposits were received, or has become insolvent, or that its capital has become impaired, or it has violated the law, or is conducting its business *in an unsafe manner* [the italics are ours], he shall, by an order addressed to such bank, direct a discontinuance of such illegal or unsafe practices, and require conformity with the law."

Furthermore, Section 9238 of that Code continues:

"If any such bank shall fail or refuse to comply with the demands made by the said superintendent, or if the said superintendent shall become satisfied that any such bank is in an insolvent or unsafe condition, or that the interests of creditors require the closing of any such bank, he may appoint an additional bank examiner to assist him in the duty of liquidation and distribution, whereupon the right of levy, or execution, or attachment against said bank or its assets shall be suspended."

Supplemental to the foregoing legislation is Section 9246, which reads:

"Should the capital stock of any state or savings bank become impaired by losses or otherwise, the superintendent of banking may require an assessment upon the stockholders, and shall

address an order to the several members of the board of directors of such bank, fixing the amount of assessment required.''

Obviously, the state banking superintendent, at the time of this contract, had before him, under the foregoing statutes, at least three general courses: First, he could have closed and liquidated the institution; second, it was permissible for him to have levied an assessment on the stock, under proper conditions; and third, he had the power to demand that the questionable paper be strengthened or removed from the assets, and replacement thereof made by sound substitutions. However, the superintendent adopted none of those remedies. But, on the other hand, that official chose to pursue a plan of his own, not authorized by statute. Under the method adopted, he contracted with appellees that the charter would be renewed and the bank permitted to continue its business in return for a guaranty that the institution was then solvent. The official examination conducted by the banking department convinced the superintendent that there were serious doubts about such solvency; yet, in effect, the superintendent bargained with the appellees that the insufficient assets would be disregarded, under the alleged agreement. Solvency was guaranteed, and therefore insolvency must occur before the indemnity would become operative; for there was no responsibility until it was determined that the bank was not in a solvent condition. Such so-called guaranty did not make the bank, in fact, solvent, but rather, it purported to make good a loss in the event there was insolvency. To avoid that catastrophe is the very purpose of the state banking department.

Theoretically at least, there could not be insolvency if the assets of the bank were adequate. Its properties and securities would probably be sound and sufficient if, from time to time, the banking department required the removal or strengthening of insufficient assets as a condition precedent to continuation in business. Likewise, in the case at bar, had the banking superintendent insisted on replacement or strengthening of questionable paper before renewing the charter, and then afterwards not permitted the continuation in business without obedience to the department's demands, the depositors and the public in general would have been protected, so far as possible under the present statute. By the so-called guaranty, however, the bank's weak-

ened financial condition was not strengthened into a substantial position. Whatever weakness existed was permitted, under the agreement, to remain. Bad assets were not removed or strengthened, but were allowed to continue as a handicap to business stability and progress; because the activities of that financial concern were dependent upon and must be conducted with such assets as were, in fact, within its possession, including the questionable, as well as the sound, financial paper.

Had the appellees purchased or guaranteed specific notes or other items held by the bank, then a different question would be presented. In that event, the bad paper thereby would be withdrawn or strengthened, so that the bank, in its business manipulations, would be armed with sound and sufficient assets for the performance of its functions. Insolvency would not be a handicap, under those circumstances. Nevertheless, in the case at bar, under the so-called guaranty, the doubtful and insufficient assets remained as a constant and continual detriment, blocking the progress of business. The banking superintendent believed the assets unsafe, but permitted the appellees, through the alleged guaranty, to overcome that official judgment, and, contrary thereto, brought about the continuance of unstableness in the institution until finally it collapsed, resulting in the loss aforesaid. Manifestly, such an agreement tended to lead the superintendent away from his official duty and started him upon a voyage uncharted by, and contrary to, the statutes. Thereby the superintendent was induced to abandon "the discharge of an official duty." Public policy clearly prevents that illegal course. *Cole v. Parker,* 7 Iowa (Clarke) 167; *Cass County v. Beck & Co.,* 76 Iowa 487; *Dodson v. McCurnin,* 178 Iowa 1211.

It is thus concluded with full realization that courts should be cautious in nullifying contracts. *Richmond v. Dubuque & S. C. R. Co.,* 26 Iowa 191; *Cole v. Brown-Hurley Hdw. Co.,* 139 Iowa 487; *Livingston v. Chicago & N. W. R. Co.,* 142 Iowa 404; *Griswold v. Illinois Cent. R. Co.,* 90 Iowa 265; *Kemble v. Weaver,* 200 Iowa 1333.

"The test to be applied to a contract of this kind is whether it is, in its nature, such as may be injurious to the public. The question of its actual result is not involved in the inquiry." *Livingston v. Chicago & N. W. R. Co.,* supra.

See, also, *Kentucky Assn. of Highway Contractors v. Williams*, 213 Ky. 167 (280 S. W. 937).

"The policy of the law in declaring void agreements and securities not taken in conformity to the statute, when attempted to be set up and enforced by the officer, is to guard against official oppression, on the one side, and a lax performance of duty on the other." *Cole v. Parker*, supra.

Giving due prominence, as we must, to the foregoing definition, caution, and test, it is plain that the contract sued upon cannot be enforced, because it contravenes the statutes aforesaid, opposes the established interests of society, and tends to injure the public in general. Argument is advanced by the appellant, however, that the above and foregoing doctrine is inconsistent with the decisions reached in *In re Estate of Prunty*, 201 Iowa 670; *Hills Sav. Bank v. Hirt*, 204 Iowa 940, 941; *Farmers State Bank v. Fisher*, 204 Iowa 1049. A careful study and analysis, however, of those cases will reveal a clear distinction between the facts there involved and those presented in the instant controversy. In the *Prunty* case, supra, we did not discuss a general warranty of solvency, but rather, considered a contract whereby officers and directors guaranteed four separate items of paper. Fortified by that guaranty, the superintendent of banking decided that the paper was good, and therefore left it in the bank. Hence, the bank was fully solvent, and was able to proceed with its duties, unhandicapped by doubtful or uncertain assets; while, in the case at bar, the individual items in the Hedrick State Bank were not removed or guaranteed, but left in their dubious and questionable state. Therewith the institution was required to perform its duties, thus hindered and embarrassed, because the guaranty did not come into operation unless and until there was insolvency. Moreover, the superintendent believed the Hedrick State Bank to be insolvent, or in a weakened condition. Strengthening was required immediately; yet, regardless of the official's judgment in that regard, he permitted the alleged guaranty to seduce him from his path of duty, and allowed the insufficient assets to remain unstrengthened and unreplaced.

Again, in the *Hills Sav. Bank v. Hirt* case, supra, the officers and directors individually purchased of the bank, under the direction of the state banking superintendent, certain doubtful

paper. These officers gave their notes to the bank for the consideration of the purchase. Contained within the agreement therefor was the following sentence:

" 'It is further agreed that no notes or bills purchased by the directors hereunder shall again at any time reappear in the assets of said Hills Savings Bank.' "

Here again, the bank, by that action of its officers and directors, was made a solvent concern. Insolvency was not permitted to continue, because after that transaction there was no doubtful or uncertain paper among the assets of the institution.

Likewise, in the *Fisher* case, supra, a note was given to the bank by certain directors and stockholders thereof. The amount of the note was $2,700, and its purpose was to remove frozen assets in the bank to that extent. Resultantly, the uncertain or questionable paper was removed, and the new and sound note substituted therefor. Thus the bank remained sound and solvent. Wherefore a distinction clearly appears between the three cases just discussed and the one at bar. Each of the former cases involved facts where the bad paper was either removed or strengthened, so that the institution was safely solvent; while here the questionable assets remained, to weaken and hinder the Hedrick State Bank, because the alleged guarantors could not be called upon for assistance until there was insolvency.

The judgment of the district court, therefore, is affirmed.— *Affirmed.*

ALBERT, C. J., and EVANS, DE GRAFF, MORLING, and GRIMM, JJ., concur.