BOARD OF EDUCATION OF LOUISVILLE v. SOCIETY OF ALUMNI OF LOUISVILLE MALE HIGH SCHOOL, Inc.

Court of Appeals of Kentucky.

March 16, 1951.

Rehearing Denied June 15, 1951.

932

Wm. T. Baskett, Lawrence S. Grauman, Louisville, for appellant.

Henry L. Brooks, James B. Young, and Martin J. Duffy, Jr., all of Louisville, for appellee.

## CAMMACK, Chief Justice.

The question involved on this appeal is whether the Louisville Board of Education can institute coeducation in the Louisville Male High School. The Society of the Alumni of the Louisville Male High School challenged the Board's right to do so because of a provision in a deed to the land on which the school plant is located. This provision stipulates that the property can be used only for the benefit of the Louisville Male High School and the white male pupils thereof. The agreement was entered into by the Louisville School Board and the Alumni Association of the Louisville Male High School. The Society of the Alumni of the Louisville Male High School, plaintiff below, is the successor of the Alumni Association of the Louisville Male High School. When the Board of Education sought to inaugurate a city-wide program of coeducation the Male Alumni brought this action to enforce the provision of the deed referred to above. The appeal is from a judgment upholding the position of the Alumni to the effect that the covenant was binding upon the Board of Education.

The controversy can be better understood by a brief review of the facts surrounding the execution of the deed in 1909. Apparently, at that time the School Board was having difficulty in raising funds to purchase the land in question, namely, a city block in Louisville at the corner of Brook and Breckinridge Streets. The Alumni raised $25,000 and contributed it toward the purchase of the lot. That amount represented 5/12 of the total purchase price of $60,000 for the unimproved lot. In consideration of this contribution the School Board allowed the Alumni Association to be made a third party to the deed conveying the land though the Association was neither a grantor nor a grantee. The following provision was included in the deed:

"And This Deed Further Witnesseth: That Whereas the Alumni Association of the Louisville Male High School has raised and caused to be paid Twenty-five Thousand ($25,000) Dollars of the purchase price of said property, which payment was made upon the condition that said property is to be used exclusively for the benefit of the Lousiville Male High School and the white male pupils thereof, the said Louisville School Board hereby covenants and agrees with said Alumni Association of the Louisville Male High School that it will hold said property for the exclusive use and benefit of said Male High School of Louisville and the white male pupils thereof, and that the said Alumni Association of the Louisville Male High School, or its successors, being a general organization of the Alumni of the said Louisville Male High School, shall have the right to enforce this covenant and agreement."

Within a few years the School Board built the Louisville Male High School plant on the land. The building was paid for from school taxes and funds produced from the sale of school bonds. The original building, together with subsequent improvements, is said to have a present day replacement value of between $3 million and $3½ million dollars. Since the erection of the first building the plant has been used exclusively as a school for boys, except during the summer months, when it has been used for both boys and girls. The Male High School is a part of the Louisville public school system, and, insofar as this litigation is concerned, has never had any corporate existence, legal entity or self-governing authority.

In October, 1949, the Louisville Board of Education passed a resolution by majority vote providing for the redistricting

of its high schools, and for the establishment of coeducation in Male High School as a part of its general program of instruction. The Board found that it was no longer advisable to conduct any part of its school system on the basis of maintaining separate schools for its male and female students, and it made plans to use certain school plants for both boys and girls that formerly had been used exclusively either for boys or for girls. One reason given for the change was that the school district might have schools located more conveniently in the various sections of the City and thus cause many students to travel shorter distances to and from school; and, further the School Board decided that coeducational instruction was desirable as a general educational policy.

In finding in favor of the Male Alumni, the chancellor held that the covenant was still binding on the Board of Education and that it was prohibited from converting Male High School to a system of coeducation. He found that the agreement was not void as violative of public policy, inasmuch as there was no public policy against noncoeducational instruction. Apparently, he conceived that to be the public policy question involved. We take a different view of the case. We think the public policy question before us is not whether coeducation is desirable or undesirable in any or all of the Louisville Public Schools, but rather whether it is inimical to the public's best interests to have the discretion of the Board of Education bound or restricted in the manner that an enforcement of the covenant would necessitate.

The Board of Education contends vigorously that the covenant is void because it concerns a "police power function," but we take a different view of the case and deem it unnecessary to discuss this question. A more forceful argument is that that covenant was an attempted ceding away of governmental powers by the School Board and hence void.

In this State public education has long been recognized as a function of State government, and members of boards of education have been held to be state officers. City of Louisville v. Commonwealth, 134

Ky. 488, 121 S.W. 411. Sections 183 to 189, inclusive of our Constitution deal with public education. Under Section 183 the General Assembly is required by appropriate legislation to provide for an efficient system of common schools throughout the State. Section 189 expressly provides that no tax or fund raised or levied for education purposes shall be appropriated to, or used by, or in aid of, any church, sectarian or denominational school.

Under KRS 156.010, the State Board of Education is vested with the management and control of the public school system. Though the State Board was an ex officio body in 1909, it had then the same general powers it now has. Section 4382, Carroll's Kentucky Statutes 1909.

A local school board is a body politic, with corporate powers. KRS 160.160. Under KRS 160.290, a school board is vested with general control and management of the public schools in its district, and may provide such courses of instruction and other services as it deems necessary for the promotion of education and the general health and welfare of its pupils, consistent with the rules and regulations of the State Board of Education.

Section 2949, Carroll's Kentucky Statutes 1909, among other things, provided that the school board in a city of the first class (Louisville) then had substantially the same powers as the Louisville Board of Education now has. In earlier compilations of the school laws, as there now are, there were provisions under which school districts could accept donations and gifts. Section 2949, Carroll's Kentucky Statutes 1909, provided that the school board in a city of the first class could accept gifts and donations and use them for the purpose and intent for which they were granted or dedicated, but that section expressly provided that: " * * * No portion of the property or funds held or raised for said schools shall ever be applied to the support of any school or schools not entirely under the control and management of the said board. * * * " Here was a clear declaration of public policy by the General Assembly as to the management and control.

of property or funds held or raised for public education.

■ A local school board is a quasi-municipal corporation, and is governed by rules applicable to strict municipalities. Board of Education of Kenton County v. Talbott, 286 Ky. 543, 151 S.W.2d 42.

■■ In McQuillin on Municipal Corporations, Vol. 10, section 29.05, p. 172, it is said: "* * * Restrictions on power (of a municipal corporation) to contract are designed to protect the public rather than those who contract with the municipality."

Section 29.07, p. 190:

"* * * No part of any power conferred upon the corporation can be transferred or delegated to other persons; nor can the city or town through its officers grant away by contract or otherwise to private corporations or individuals the authority to control the powers and functions properly appertaining to the municipal government. * * *

"* * * the law is well settled that a city can not by contract deprive itself of any of its legislative powers * * *."

In City of Middlesboro v. Kentucky Utilities Co., 284 Ky. 833, 146 S.W.2d 48, 52, in which we held that a city having authority to engage in an electric supply business could not contract with the TVA to purchase and distribute current only as approved by that Federal Agency, because it placed out of the City's control its governmental powers in this respect, we used the following language: "Public office is a public trust and it is fundamental that the performance of the trust can not be farmed out or delegated to one not chosen directly or indirectly by the citizens, and then only under permission of the legislative body which established the trust. * * *"

■ Obviously, what has been said as to the prohibition against a municipality bargaining away its governmental powers could be said with equal or even greater force when speaking of an arm of the State, as is a district board of education. The attempted ceding away of its governmental powers or the restricting of its discretion by the School Board was in direct conflict with the provisions of Section 2949, Carroll's Kentucky Statutes 1909, and therefore void as being against public policy. The general rule relating to such contracts is discussed in 12 Am. Jur., Contracts, section 167. See also the case of Kentucky Association of Highway Contractors v. Williams, 213 Ky. 167, 280 S.W. 937, 45 A.L.R. 544.

It will not do to say that the Louisville Male High School was left entirely under the control and management of the Board of Education after 1909, because the primary purpose of the covenant in question, evidenced by its own language, expressly provided for a perpetual limited or restricted use of the property, namely, "for the benefit of the Louisville Male High School and the white male pupils thereof." Obviously, the purpose of the covenant was to restrict the program of instruction in the part of the Louisville school system which was to be erected on the land for which the Male Alumni contributed $25,000 of the purchase price to one where only white male students were taught. This we think the School Board had no right to do.

As pointed out above, the chancellor, in holding that the covenant was not against public policy, considered it from the standpoint of whether coeducation was good or evil. We are not concerned with the merits or demerits of coeducation as such, but rather the question of public policy goes to whether it is calculated to be detrimental to the public interest to have a school board limited by contract, as was the School Board, to a specified system of instruction in one of its major school plants. We think there was an invalid delegation of governmental powers in that the covenant permanently restricted the School Board's discretionary powers.

■ School boards have no powers except those relating to the operation and management of public schools. They are vested with broad governmental powers in the management of the public schools under their jurisdiction. Under the general supervision and direction of the State Board of Education, local boards of education may choose that program of instruction which they deem for the best interests and welfare of their pupils, be it coeducation or the

separation of the sexes. Who can question seriously the right of a local school board to determine the manner in which its school plants and facilities shall be used, and as to what school shall serve certain geographical areas, especially in a large city? It is fallacious to argue that there would be no interference with the governmental powers of the Louisville Board of Education because of an inhibition in the covenant as to use of one of its school plants. A school plant, such as that of the Louisville Male High School, is such an integral part of the Louisville district school system that it can not be treated as a separate entity and operated as an island, so to speak, with a different system of instruction therein from that in operation in the rest of the district schools. It is not hard to visualize that the School Board's plan of coeducation and geographical distribution of the pupils in its district might be wholly unfeasible with this large and vital part of its system being operated under a different system of instruction. As indicated above, we are not concerned whether boys or girls, or both, attend school at the plant which has formerly been used for male students only, but rather what effect would the enforcement of the covenant have upon the whole school system of the Louisville district.

We have held frequently that reversionary interests in school property will be enforced. Usually in such cases, there has been a real right remaining in the grantor and the grantee receives the fee less the property interest which the grantor retains. Here the Male Alumni Association was neither a grantor nor a grantee. Furthermore, it is not asserted that the Male Alumni have anything more than a contractual right, which, as we have noted, directs itself to the system of instruction to be followed in one of the school district's major plants.

A casual reading of the opinion in the case of Woman's Hospital League v. City of Paducah, 188 Ky. 604, 223 S.W. 159, 164, might lead one to believe that case has some bearing on the one before us. However, an analysis of it will show the contrary. The question before the Court in the Paducah Case involved a motion to dissolve a temporary injunction, and was not a hearing on the merits of the case. The City and the Hospital League had entered into a contract under which the League was to pay one-half of the cost of the construction of a hospital erected on City property for persons afflicted with contagious diseases. The hospital was erected and when the City sought to discontinue the use of the plant for a hospital for persons with contagious diseases and use it for a nurses' home the lower court enjoined the City from making the change. This Court refused to dissolve the temporary injunction. During the course of the opinion it was said: "It is not intended to declare in this opinion that the mayor and commissioners of the city of Paducah have not the power sooner, and after a fair test by its use in the isolation and care of persons afflicted with contagious diseases, to determine whether the hospital in question is no longer adequate to the needs of those intended to be benefited by it, and upon so finding discontinue its use on that ground; * * *."

It must be borne in mind also that our concept of the State's responsibility for operating a program of public health is vastly different from that pertaining to public education. As pointed out in the case of Kentucky Building Commission v. Effron, 310 Ky. 355, 220 S.W.2d 836, hospitals, in their inception, were charitable organizations, usually sponsored by religious sects which owned and operated them. All levels of government have made major progress in assuming the burden of operating hospitals as a public service. We have approved the contribution of public funds to private hospitals not operated for profit which are open to the public.

In the case at bar we do not think the Male Alumni can invoke the covenant in the deed to interfere with the exercise by the Board of Education of its discretionary powers in the management and control of the public schools under its jurisdiction. The rights of the Male Alumni, if any, to recover the amount contributed by it on the purchase price of the school lot in 1909, are not before us for determination at this time.

936

Judgment reversed, with directions to set it aside, and for proceedings consistent with this opinion.

MOREMEN, J., not sitting.