240 P.2d 833

**STEARNS et al. v. WILLIAMS et ux.**

**No. 7745.**

Supreme Court of Idaho.

Jan. 31, 1952.

O. R. Baum, Pocatello, Oscar W. Worth-wine, Boise, for appellants.

Albaugh, Bloem, Barnard & Smith, Idaho Falls, for respondents.

THOMAS, Justice.

H. T. Stearns and C. D. Stearns, husband and wife, appellants herein, will be referred to as plaintiffs and Joseph Williams and Myrtle Williams, husband and wife, will be referred to as defendants.

The plaintiffs brought an action for specific performance of a real estate sales contract. It is deemed advisable to detail some of the salient facts before setting forth and considering the numerous assignments of error.

The plaintiff H. T. Stearns, a geologist, had been for more than twenty-five years prior to 1946 in the employment of the federal government and had during such employment made an extensive survey of the water potential and other geological aspects of the Arco area in Butte County, and had written and submitted a report in connection therewith to the federal government which was published some several years ago. During this time Stearns observed and made a study of the gravel deposits in the Craters of the Moon area and discovered many deposits which were exceptionally good for the manufacture of building and road materials, but made no filings thereon at the time because he was in the government service.

Either in 1938 or 1939, no definite date being fixed in the records, the plaintiffs were married. In 1946 Mr. Stearns resigned from government service and has since been generally engaged as a private consulting geologist and did on several occasions, both in 1947 and in 1948, visit the Arco area.

On or about January 5, 1949 the Atomic Energy Commission, an agency of the federal government, engaged the services of a Detroit engineering firm, under written contract, to survey, study and make a report on a site near Arco, Idaho, and one at Fort Peck, Montana, both of which sites the government had under consideration with the probability of selecting one of them for the location of an atomic reactor plant.

On January 9, 1949 the Detroit firm entered into a written sub-contract with Mr. Stearns on a daily salary basis to make a report on the water potential and geological conditions and other pertinent factors which were to be considered in the selection of a site for the location of an atomic reactor plant.

The sub-contract between the engineering firm and Stearns specifically set forth that

both sites had already been made known to Stearns and that the Commission, in engaging the engineering firm, desired that a survey and comprehensive study of the availability of water supply at each site be obtained and that Stearns was to do all things necessary to investigate and prepare and submit a report on each site with reference to water potential, geological conditions, and other pertinent factors. The sub-contract then specifically provided as follows: "The said report, etc. to be as contemplated by the Commission in its contract of January 5, 1949, with the Contractor, the applicable provisions of which contract have been communicated to the sub-contractor and which he understands and accepts as a part hereof."

The sub-contract provided also that Stearns would undertake the work immediately and proceed with haste to complete and submit his report not later than January 25, 1949; that he would consult and cooperate with geologists, and others employed by the engineering firm in connection with the survey, as well as with geologists and others employed by the United States Government; Stearns further under the provisions of the sub-contract expressly agreed to participate in all meetings and conferences arranged by the engineering firm in connection with the conduct of the studies.

The sub-contract specifically provides that both the engineering firm and Stearns agree that all the Commission's conditions and requirements of security and secrecy shall be strictly observed by Stearns.

On or about January 21, 1949 Stearns left Pocatello, on his own time, and went to Arco and there, on January 22 of the same year, negotiated for the purchase of the property of defendants, and also two other tracts under separate contracts to purchase; all the contracts were negotiated in the name of Mrs. Stearns, through a real estate broker, and her separate funds were used to make the required payments under each contract.

The purchase price of the property of defendants, consisting of twenty-nine lots, was $435; the down-payment of $50 was made after the contract was executed by the defendants on January 26, 1949 and the balance was payable on or before April 26, 1949.

Mr. Stearns completed and mailed his report on both sites on January 31, 1949, and on March 23 of the same year the Atomic Energy Commission made its first public announcement that the Arco site had been selected for the installation of an atomic reactor plant.

Immediately following the public announcement of the selection, there was considerable demand for real property in and adjacent to Arco and the market value rose sharply. The property of defendants was not reasonably worth more than the contract price at the time the contract was entered into but following the public an-

nouncement, and continuously up to the time of the trial in June 1950, its fair market value was many times the sale price; its value following the announcement and at the time of the trial was variously placed at from $100 to $500 a lot.

The plaintiffs in the month of April 1949 and prior to the date the balance was payable under the contract made tender of the payment, which defendants refused. Plaintiffs then commenced the action for specific performance.

The defendants by their answer and by way of an affirmative defense alleged fraud and deceit in the procurement of the contract, inadequate consideration thereof, and that such contract offended public policy. The court denied specific performance and dismissed the action on the ground that the contract offended public policy.

The appellants set forth some sixteen assignments of error. We do not deem it necessary to separately state and treat these assignments. The errors are generally directed to the findings of fact, conclusions, and judgment entered, and in refusing to sustain objections to questions propounded to the plaintiffs who were called as witnesses by defendants, under the provisions of Sec. 9–1206, I.C., and for refusing upon motion of plaintiffs to strike such testimony of the plaintiffs. All the assignments of error essential to the determination of the case will be considered and treated in connection with the disposition of the basic legal problems presented by the appeal.

Basically the defendants urge that the plaintiffs were engaged in a joint enterprise in the purchase of the property at a time when Mr. Stearns was indirectly, if not directly, employed by the federal government in a trust and confidential capacity upon a project of a highly secret nature, in which society (the public) had an interest and in which Stearns had such a duty that he could not legally, in the interests of the public, enter into an agreement which would have a tendency to create a conflict or an antagonism between his duty to the public and his own private or personal interests; that the purchase of the property in the area during the time he was employed to report upon the site would necessarily have a tendency, at least, to influence his report to the end that the Arco site might be selected to the exclusion of the Fort Peck site, even though the Fort Peck site might in his unbiased opinion be the more desirable; that by making such purchases he was voluntarily placing himself in a position where there might well develop a conflict between his public duty and his private interest; and that where a tendency toward such conflict is present a court of equity will not lend its aid to enforce such a contract.

It was urged that irrespective of the disparity between the fair value of the property and the contract price, or even though the evidence would not support fraud, the contract was void on the further ground of public policy because it had an

evil tendency to bring the duty of Stearns to the government in conflict with his personal interest.

■ Whether a contract is against public policy is a question of law for the court to be determined from all the facts and circumstances of each case. Stansell v. Roach, 147 Tenn. 183, 246 S.W. 520, 29 A.L.R. 143; 17 C.J.S., Contracts, § 211(d), page 568, note 75.

■ An agreement voluntarily made between competent persons is not lightly to be set aside on the grounds of public policy, or because it has turned out unfortunately for one party. Crimmins & Peirce Co. v. Kidder Peabody Acceptance Corp., 282 Mass. 367, 185 N.E. 383, 88 A.L.R. 1122. However, such contracts are subject to the limitation that they must not contravene public policy. Huey v. Brand, Tex.Civ. App., .92 S.W.2d 505; St. Regis Candies v. Hovas, 117 Tex. 313, 3 S.W.2d 429; Id., Tex.Civ.App., 8 S.W.2d 574; 12 Am.Jur., §§ 167 and 172, pp. 662 and 670.

■ The usual test applied by courts in determining whether a contract offends public policy and is antagonistic to the public interest is whether the contract has a tendency toward such an evil, Wood v. Casserleigh, 30 Colo. 287, 71 P. 360; if it is opposed to the interest of the public, or has a tendency to offend public policy, it will be declared invalid, even though the parties acted in good faith and no injury to the public would result in the particular instance; the test to be applied is not what is actually done but that which may or might be done under the terms of the contract; it is the evil tendency of the contract and not its actual injury to the public that is determinative, as the law looks to its general tendency and closes the door to temptation by refusing to recognize such agreements. 17 C.J.S., Contracts, § 211, page 564, notes 42–46.

It is contended by the appellants that the contract of purchase was made by Mrs. Stearns through her agent, Mr. Stearns, with her separate funds and that she had no confidential or fiduciary relationship to the government nor any knowledge of the proposed project; and that knowledge of the proposed project possessed by Mr. Stearns cannot be imputed to her; that information acquired by Mr. Stearns outside the scope of his agency and under circumstances which made it his legal duty to refrain from divulging to his principal, Mrs. Stearns, and which he did not so divulge, could not be imputed to or binding upon her as principal; the lower court held that Mr. and Mrs. Stearns were joint adventurers.

There is considerable evidence in the record as to the relationship existing between Mr. and Mrs. Stearns with reference to the purchase of the property and the plans for its use; the record is quite clear that Mr. Stearns was possessed of superior knowledge of the geology of the surrounding country and that he had a very valuable and secret process for the manufacture of

building material from the gravel and cinder deposits in the Arco area; that it was contemplated that this process would be used in the enterprise, and that both Mr. and Mrs. Stearns conceived such an undertaking many years earlier; that the purchase in question and other property were to be purchased for carrying out this enterprise.

The evidence in respect to their relationship reveals many striking inconsistencies; throughout the testimony of Mrs. Stearns she continually, when testifying concerning the plans, the filing of placer claims on gravel and cinder deposits and the testing of such deposits, referred to herself and Mr. Stearns; she spoke of their plans and filings, that they were going to construct a building upon the premises to manufacture building materials; she also spoke of it as their project and that they had acquired it and were going to set up a plant; Mr. Stearns specifically stated in his testimony that they were going to set up a plant and referred to Mrs. Stearns and himself, in testifying that they had a plan to make the plant; that they had a secret process which was very valuable; in one place in his testimony, he testified that they had purchased the Beers property which was adjacent to the property in question, and testified further that they had to have the Williams property also as they needed it; when questioned with reference to his contemplated market he again spoke of he and Mrs. Stearns having a market for the material and that they had taken an option on machinery; at one place in his testimony he testified specifically that it was his intention to cash in on the knowledge he acquired in the particular area when he was working for the government; however, when very carefully worded and pointed questions were asked of him, he positively testified that he was buying the property for Mrs. Stearns, and that she was going to build the structure on the property and to operate it, and that no money of his was being used in the property and that he was going to turn his secret process over to her; he finally testified under examination by his own counsel that it was the intention of himself and his wife to erect a block and brick plant on the property. The above analysis briefly sets forth the import of the testimony of both Mr. and Mrs. Stearns with reference to the contemplated project; upon the above uncertain and indefinite evidence, which contains many inconsistencies, the court below concluded that Mr. and Mrs. Stearns were engaged in a joint adventure.

Whether a relation of joint adventurers exists is primarily a question of fact for the trial court to determine from the facts and the inferences to be drawn therefrom. Milton Kauffman, Inc., v. Superior Court, 94 Cal.App.2d 8, 210 P.2d 88; San Francisco Iron & Metal Co. v. American Milling & Industrial Co., 115 Cal.App. 238, 1 P.2d 1008.

■ It is immaterial in whose name the property is acquired in a joint venture, as one holding title is a trustee for those who are so engaged in the joint enterprise. Ferguson v. Nagle, 159 Okl. 219, 15 P.2d 1.

■ To constitute a joint adventure the parties may combine their property, money, efforts, skill or knowledge in some common undertaking, and their contribution in this respect need not be equal or of the same character, but there must be some contribution by each joint adventurer of something promotive of the enterprise. Parker v. Trefry, 58 Cal.App.2d 69, 136 P.2d 55; Rae v. Cameron, 112 Mont. 159, 114 P.2d 1060; Nelson v. Abraham, 29 Cal.2d 745, 177 P.2d 931; 48 C.J.S., Joint Adventures, § 1, page 802; § 2, page 814, note 95; § 8, page 836; and even though one adventurer owns all the property used in the joint adventure, this is not conclusive in determining whether such relationship exists. United States Fidelity & Guaranty Co. v. Dawson Produce Co., 200 Okl. 540, 197 P.2d 978.

■ A contract of joint adventure need not be expressed but it may be implied, in whole or in part, from the conduct of the parties, Lane v. National Ins. Agency, 148 Or. 589, 37 P.2d 365; direct testimony or documents are not essential, Hupfeld v. Wadley, 89 Cal.App.2d 171, 200 P.2d 564; 48 C.J.S., Joint Adventures, § 3, page 816; Yeager v. Graham, 150 Kan. 411, 94 P.2d 317. Again, even though the details of such joint adventure were shown by in-definite and uncertain testimony, this does not preclude finding that such a joint adventure existed from their acts and conduct, and from the testimony and the inferences that might reasonably be drawn therefrom. Replogle v. Ray, 48 Cal.App. 2d 291, 119 P.2d 980; Milton Kauffman, Inc., v. Superior Court, supra; Nelson v. Abraham, supra.

■ A joint adventure is generally a relationship analogous to but not identical with a partnership, and is often defined as an association of two or more persons to carry out a single business enterprise with the objective of realizing a profit. McKee v. Capitol Dairies, Inc., 164 Or. 1, 99 P.2d 1013; Nelson v. Abraham, supra; Bosworth v. Eason Oil Co., 202 Okl. 359, 213 P.2d 548; Sime v. Malouf, 95 Cal. App.2d 82, 212 P.2d 946, 213 P.2d 788; 48 C.J.S., Joint Adventures, § 1, pages 801–802.

■ In a joint enterprise there must be agreement to enter into an undertaking between parties having a unity of interest in the objects or purposes of the agreement, and a common purpose in its performance, Brigham v. Munden, 142 Or. 471, 19 P.2d 1096; while a provision for sharing losses is important in construing an agreement for a joint enterprise, it is not essential, and neither an agreement to share profits nor losses is conclusive in the construction of the contract, but the intention of the parties controls. Las Vegas Machine & Engineering Works v.

Roemisch, Nev., 213 P.2d 319. As to third persons, the legal and not the actual intention controls. Snavely v. Walls, 13 Cal. App.2d 600, 57 P.2d 161; Aiken Mills v. United States, D.C., 53 F.Supp. 524; Id., 4 Cir., 144 F.2d 23.

On the basis of the testimony, the acts, conduct and surrounding circumstances as revealed by the record, the court did not err in concluding that Mr. and Mrs. Stearns were engaged in a joint adventure.

Here it is pointed out by the plaintiffs that there was no contractual or fiduciary relationship between Stearns and the government but only between Stearns and the engineering firm, and that furthermore there was no confidential or fiduciary relationship between Stearns and the defendants, but only the mere relationship of vendor and purchaser; that he owed no duty to either the government or the defendants; that for this additional reason the principle of public policy cannot be applied to defeat his rights to specific performance.

Both the contract and the sub-contract were made near the same time and in relation to the same general subject-matter, and the provisions of the contract between the engineering firm and the government were made known to Stearns; by the provisions of the sub-contract reference is made to the contract and by reference pertinent provisions of the contract are made a part of the sub-contract, and hence binding upon the sub-contractor; under its very terms the sub-contractor was placed in a position of confidence and trust and was duty-bound, not only to refrain from disclosing the nature of his work to the general public, including the defendants, but was implicitly sworn to secrecy, except perhaps to the extent, as he testified, that he could make such disclosure to some other governmental agency, such as the Navy which owned some of the grounds upon which his work was being done, if and only if it were necessary in order for him to get the information which was required of him.

The lower court refused to decree specific performance of the contract on the broad general principle that the contract offended sound public policy. The meaning of the phrase "public policy" is vague and variable; it has never been exactly defined, Strong v. Western Union Tel. Co., 18 Idaho 389, 109 P. 910, 30 L.R.A.,N.S., 409; however, the courts have with frequency approved Lord Brougham's definition of public policy as the principle which declares that no one can lawfully do that which has a tendency to be injurious to the public good. Public policy, however, is only variable in so far as the habits, capacity and opportunities of the public have become more varied and complex, and the principles to be applied have always remained unchanged and unchangeable, but courts are obliged to make new applica-

tions of old principles. 12 Am.Jur., § 169, p. 666; Skutt v. City of Grand Rapids, 275 Mich. 258, 266 N.W. 344; Finnie v. Walker, 2 Cir., 257 F. 698, 5 A.L.R. 831; 12 Am.Jur., § 167, p. 662, notes 4 and 5.

Public policy may be found and set forth in the constitution or in the statutes, or where it is found in neither it is sometimes set forth by judicial decision. Brooks v. Cooper, 50 N.J.Eq. 761, 26 A. 978, 21 L.R.A. 617, 35 Am.St.Rep. 793.

While it is often said that agreements are against public policy, because it is the policy of the law to secure fidelity in the discharge of their duties by all persons holding such positions of trust and confidence, yet it is more accurate to say that such agreements, tending to cause unfaithful conduct by fiduciaries, are illegal because they are in effect agreements to wrong or defraud the persons whose interests the fiduciaries have in charge.

The law frowns upon any act upon the part of one placed in a relationship of trust or confidence where such party places his personal interest in antagonism to duty or which tends to that result; one employed by another to transact business for him has no right to enter into an agreement with a third person which would place it in his power to wrong his principal, and which would tempt a bad man to act in bad faith toward an employer; such agreements are within the rule that the law voids agreements made with a view to place one under wrong influences, such as those which offer him a temptation to do that which may affect injuriously the right and interest of third persons; such agreements are opposed to honesty in business and are contrary to public policy. 12 Am. Jur., § 179, pp. 678–679.

However, it is urged by plaintiffs that the trial court erroneously predicated judgment on the basis that Stearns was a public officer or employee in a fiduciary position; that he is neither a public officer nor employee for the reason that no such relation can exist between two parties who have no contractual relationship. Contracts of this character are not confined to executors, administrators, trustees, agents, partners, public officers and employees but embrace any person occupying a fiduciary or confidential relationship. It need only be shown that to bring such agreements within the rule there was in fact some relationship of trust or confidence and the agreement contemplated or tended to a violation of such trust or confidence; the rule is applied even though the third person, with respect to whom the relation of trust or confidence existed, is not injured. 17 C. J.S., Contracts, § 198, page 550; Hendricks v. Wall, Tex.Civ.App., 277 S.W. 207.

From what has heretofore been set forth, to the effect that the rule is not limited to certain particular designated parties but embraces all persons who occupy a position of trust or confidence, it is not necessary to, nor do we determine whether Stearns was either a public officer or public em-

ployee; if his relationship was one of trust and confidence, of a confidential, fiduciary or even quasi-fiduciary nature, he would come within the purview of the general rule as set forth.

A fiduciary relationship does not depend upon some technical relation created by or defined in law, but it exists in cases where there has been a special confidence imposed in another who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of one reposing the confidence. Staab v. Staab, 160 Kan. 417, 163 P.2d 418; Renegar v. Bruning, 190 Okl. 340, 123 P.2d 686; Dyblie v. Dyblie, 389 Ill. 326, 59 N.E.2d 657; Szekeres v. Reed, 96 Cal.App. 2d 348, 215 P.2d 522.

Oftentimes the terms "fiduciary relation" and "confidential relation" are used interchangeably, Gerson v. Gerson, 179 Md. 171, 20 A.2d 567; Fipps v. Stidham, 174 Okl. 473, 50 P.2d 680; the confidential relationship which is protected in equity is synonymous with fiduciary relationship, Sachs v. Cluett, Peabody & Co., 265 App. Div. 497, 39 N.Y.S.2d 853; it exists whether the relationship is technically fiduciary or merely informal, whenever one trusts in and relies on the other, Sewell v. Ladd, Mo.App., 158 S.W.2d 752; Van't Hof v. Jemison, 291 Mich. 385, 289 N.W. 186. In respect to either confidential or fiduciary relationship, it is possible that an unfair advantage may be taken and where one is bound to act for the benefit of another, he can take no advantage to himself; no precise language can define the limits of such relationships, In re Null's Estate, 302 Pa. 64, 153 A. 137.

The highest consideration of public policy demands that all duties in which the government and the public are concerned shall be performed with fidelity; no one who has assumed the performance of such duties should be permitted to make the question whether he will continue in the performance in such manner a matter of private speculation, Jacobs v. Tobiason, 65 Iowa 245, 21 N.W. 590.

We have been cited to no cases, nor have we in our search discovered any cases, where the precise question has been determined, where the same general principles are involved; it would add unduly to the length of this opinion and it would serve no useful purpose to discuss and analyze the numerous cases cited in the general text where contracts have been declared illegal because their direct tendency was injurious to the public interest. Each case in this field must necessarily depend upon its own facts and circumstances; where the precise question as to whether or not a particular agreement is against public policy has not been determined, analogous cases involving the same general principles may be looked to by the court in arriving at a satisfactory conclusion, Kentucky Ass'n of Highway Contractors v. Williams, 213 Ky. 167, 280 S. W. 937, 45 A.L.R. 544.

It is the relationship which Stearns has with a third party, that is, with his government, which is of importance in this case; the very nature of his relationship to the public at the time he entered into the contract of purchase for the benefit of himself and his wife as joint adventurers should forbid him, as a matter of sound public policy, to refrain from using such confidential information and relationship to his own personal gain, where it even has a tendency to injuriously affect the public good or conflict with his public duty; more important, the temptation to color his report because of such personal interest is great and he should never have permitted such temptation to exist, and it is for such reasons and under such relationships that the courts have condemned such agreements as highly offensive to sound public policy and have refused to lend their aid. Stearns voluntarily placed himself in a position where his own interests would have a direct tendency to conflict with his obligation to the public; to sanction the contract would be to sanction an agreement which has a tendency to cause Mr. Stearns to make a favorable report on the Arco site in preference to that of any other site, even though there might be others better or equally as favorable, and thereby likely cause injury to the public; it must be borne in mind that he entered into the particular contract not after his employment had been severed but before he had completed and mailed his report.

Application of the reasoning and the general principles announced in the many cases referred to in this opinion through the text citations makes clear that the conclusion is inescapable that the government placed special confidence and trust and reliance in Stearns and that the contract which is sought to be enforced in this case had at its inception a direct evil tendency to cause Mr. Stearns to place conflicting personal interest above duty and, for such reason, even though he acted in good faith and no resulting injury to the government followed, the contract offends. public policy and this court will not lend its aid to the enforcement thereof.

It is further contended by the plaintiffs' that the judgment of the trial court is based upon a theory different than the theory upon which the case was set forth in the pleadings or tried; in this respect it is urged that the defendants alleged in their answer a defense based upon misrepresentation of material facts; that there is no allegation that Mr. Stearns was a public officer or employee and, as such, owed a duty to the government to refrain from entering into any contract which might have a tendency to be injurious to the public good. It is further urged that the trial judge arrived at a decision on the erroneous theory that Mr. Stearns was a public officer or employee, and a theory which is entirely different than the theory upon which the defendants tried the case; the court did find and conclude that there

was no misrepresentation of any material fact, or any fraud or overreaching in the procurement of the contract, but concluded that Stearns was a public employee and that specific performance of the contract was denied on the grounds of sound public policy.

A party to a contract, void as against public policy, cannot waive its illegality by failure to specially plead the defense or otherwise, but whenever the same is made to appear at any stage of the case, it becomes the duty of a court to refuse to enforce it, Reed v. Johnson, 27 Wash. 42, 67 P. 381, 57 L.R.A. 404; again, a court of equity will not knowingly aid in the furtherance of an illegal transaction; in harmony with this principle, it does not concern itself as to the manner in which the illegality of a matter before it is brought to its attention, Wright v. Corbin, 190 Wash. 260, 67 P.2d 868. Furthermore, the court itself will raise the question of the invalidity of a contract which offends public policy and, as stated before, the parties cannot waive it, Noonan v. Gilbert, 63 App.D.C. 30, 68 F.2d 775; McCowen v. Pew, 153 Cal. 735, 96 P. 893, 21 L.R.A.,N. S., 800. The court, having once acquired jurisdiction to make equitable disposition of the case, retains such jurisdiction to do equity, even though its disposition of the case will be grounded upon some theory not set forth in the pleadings, nor urged to the court, but which is supported by the evidence.

The plaintiffs contend that the court erred after timely objection in the admission of certain testimony of Mr. and Mrs. Stearns as adverse parties under cross-examination, under the provisions of Sec. 9–1206, I.C., and in refusing to grant their motion to strike such testimony; it is urged in this connection that an adverse party can be interrogated under this statute only with reference to matters peculiarly within his knowledge and which cannot in all probability be developed otherwise; that the court in permitting such examination of these witnesses abused its discretion for the reason that such witnesses were interrogated upon many matters which were not peculiarly within their respective knowledge and which might well have been developed through other sources; plaintiffs rely on the case of Boeck v. Boeck, 29 Idaho 639, 161 P. 576, and Darry v. Cox, 28 Idaho 519, 155 P. 660, for support of their position; in the main, the testimony so adduced and objected to covered matters which were peculiarly within the knowledge of the witnesses and which were not otherwise readily available; again, much of such testimony was of a preliminary nature.

The statutes such as Sec. 9–1206, I.C., were enacted to enable a party to call his adversary; such statutes, which are found in many states, are remedial in character and are liberally construed in order to accomplish their primary purpose; in applying liberal construction to such stat-

utes it has been held that any relevant matter in issue is within the scope of the examination of witnesses called under such statute; it has been held under a similar statute in California that a party may call an adverse party as a witness to prove or to be interrogated concerning facts material to his case, and that he may be called to prove a single material fact or any number of material facts or even the whole case; Lawless v. Calaway, 24 Cal.2d 81, 147 P.2d 604; Intagliata v. Shipowners & Merchants Towboat Co., Cal.App., 151 P. 2d 133; see also Morton v. Morton Realty Co., 41 Idaho 729, 241 P. 1014.

 Cross-examination and the extent of such examination of an adverse party under this section of the statute are largely in the discretion of the trial court, Portland Cattle Loan Co. v. Gemmell, 41 Idaho 756, 242 P. 798; Evans v. Bannock County, 59 Idaho 442, 83 P.2d 427; while objection to such examination was seasonably made and a timely motion to strike such testimony was likewise made, yet plaintiffs' counsel examined such witnesses fully and at length on such matters which were covered by the cross-examination under the statute; in many respects the cross-examination of the adverse party under the statute covered matters which were peculiarly within the knowledge of the witnesses examined and not readily obtainable otherwise; it appears that the plaintiffs suffered no disadvantage or prejudice from such examination and we find no abuse of judicial discretion by the court in permitting such examination and in denying the motion to strike such testimony at the conclusion thereof. The conclusions reached in this respect are not out of harmony with the holdings in either the Boeck case or the Darry case, supra.

Having considered all errors assigned and finding no error, the judgment of the district court should be and is affirmed.

Costs to respondents.

GIVENS, C. J., and PORTER, TAYLOR and KEETON, JJ., concur.