COMMONWEALTH of Kentucky ex rel. DEPARTMENT FOR NATURAL RESOURCES AND ENVIRONMENTAL PROTECTION et al., Appellants,

v.

Morris STEPHENS et al., Appellees (two cases).

Morris STEPHENS et al., Cross-Appellants,

v.

COMMONWEALTH of Kentucky ex rel. DEPARTMENT FOR NATURAL RESOURCES AND ENVIRONMENTAL PROTECTION et al., Cross-Appellees.

Supreme Court of Kentucky.

July 2, 1976.

Robert F. Stephens, Atty. Gen., Frankfort, R. Lee Armbruster, Special Asst. Atty. Gen., George L. Seay, Jr., Dept. N. R., Frankfort, for appellants and cross-appellees.

Homer W. Ramsey, Whitley City, J. B. Johnson, Sr., Williamsburg, for appellees and cross-appellants Morris Stephens and Tombstone Junction Enterprises.

A. Robert Doll, Ronald D. Ray, Greenebaum, Doll, Matthews & Boone, Louisville, Lively M. Wilson, Winfrey P. Blackburn, Jr., Stites, McElwain & Fowler, Louisville, J. T. Begley, Lexington, for amicus curiae.

STERNBERG, Justice.

The appeal of these three consolidated cases evidences a running dispute between the Kentucky Department for Natural Resources and Environmental Protection (the Commonwealth) and the landowners concerning rights to property within the Wild Rivers area of the Cumberland River. All of the issues can logically be disposed of in this one opinion, and they will be so handled. The appellants will be referred to as the Commonwealth and the appellees will be referred to as the landowners.

It will be helpful to a full and complete understanding of these proceedings and of the issues presented if the proceedings in the Franklin Circuit Court are detailed. They are:

11–1–74 Verified complaint filed in which the Commonwealth sought to enjoin the landowners " * ' * * from cutting timber and otherwise disturbing an area designated as a Wild River."

11–1–74 The restraining order issued, prohibiting the defendants " * * * from cutting timber, road building and any other land uses not allowed by KRS 146.-290 within the exterior boundaries of a stream section designated by KRS Chapter 146 as a Wild River, that section being the Cumberland River from Summer Shoals to the backwater of Lake Cumberland and the defendants' activities being within the section, approximately 300 feet upstream from Cumberland Falls on the west bank of the Cumberland River in McCreary County, Kentucky, * * * "

11–20–74 Landowners filed a motion to dissolve the restraining order and a motion to dismiss under CR 12.02.

12–6–74 Commonwealth filed a motion for a temporary injunction.

12–10–74 Commonwealth's motion granted and temporary injunction issued. It is substantially the same as the restraining order issued on November 1, 1974.

6–24–75 Circuit court opinion filed.

8–27–75 Final judgment entered, in which it was adjudged:

"1) The Kentucky Wild Rivers Act, KRS Chapter 146 is constitutional and the

injunctive process is available to the Attorney General to prevent or correct a condition constituting a violation of that Act.

"2) The Commonwealth shall, simultaneously with the request for injunctive relief, initiate proceedings either by condemnation or otherwise to compensate the land owner for the rights to his real property taken by the Commonwealth's enforcement of the Wild Rivers Act.

"3) The Defendants' motion to dismiss and the motion to dissolve the temporary restraining order are overruled.

"4) The Defendants may apply to this Court for such relief as justice may require if the Commonwealth does not forthwith take the action required by this judgment.

"5) This matter will be retained on the docket pending further orders of this Court."

9–23–75 Commonwealth filed its notice of appeal.

10–1–75 Commonwealth filed its designation of record on appeal.

10–9–75 Landowners filed a notice of cross-appeal and a designation of record on cross-appeal.

10–27–75 Landowners filed a motion to dissolve restraining order and motion to find "plaintiff in contempt of Court" and "to transfer this action to the McCreary Circuit Court," supported by the affidavits of Morris Stephens and Homer Ramsey.

10–27–75 Landowners filed a motion for a rule to issue requiring the Commonwealth to show cause why it should not be punished for contempt of court.

10–27–75 Order issued requiring Commonwealth to appear and show cause why it should not be adjudged in contempt of court.

11–3–75 Order entered as follows:

"A Rule having issued against plaintiffs, returnable on November 3, 1975, to show cause why plaintiffs should not be held in contempt of this Court and the plaintiffs having appeared and the Court having heard arguments of counsel and having been sufficiently advised, is of the opinion that the plaintiffs have failed to comply with the final Order and Judgment of this Court in that plaintiffs have failed to initiate proceedings to compensate the defendants for their property. Therefore, it is hereby Ordered and Adjudged that the plaintiffs are found to be in contempt of this Court.

In order to allow the plaintiffs the opportunity to appeal to the Court of Appeals, this Order shall not become effective until November 13, 1975."

The Wild Rivers Act was enacted at the regular session of the 1972 General Assembly (SB 138, Ch. 117) and amended at the regular session of the 1976 General Assembly (SB 309, Ch. 197).

File No. 75–1050 is an appeal by the Commonwealth from the final judgment of the Franklin Circuit Court dated August 27, 1975. File No. 75–1099 is a cross-appeal by the landowners from the same judgment. File No. 75–1177 is an appeal by the Commonwealth from an order of the Franklin Circuit Court dated November 3, 1975, which found the Commonwealth to be in contempt of court.

The Kentucky Wild Rivers Act proposes to preserve certain streams in their present state because their natural, scenic, scientific, and aesthetic values outweigh their value for commercial use or development. (KRS 146.220). One of the streams designated by the act is "The Cumberland River from Summer Shoals to the backwater of Lake Cumberland." (KRS 146.240(1)). Somewhere within this general area lies the property of the landowners, and it is the use of this property by the landowners that has been enjoined.

At the outset we are faced with the proposition that the privilege of a landowner to the use and enjoyment of his property in any way he sees fit, so long as he does not infringe upon the rights of others, is an inviolate incident to total ownership. *Three Rivers Rock Company v. Reed Crushed Stone Company*, Ky., 530 S.W.2d 202 (1975). Any infringement of

this right comes as an exception. Of course, the right of a state to regulate is within is police powers. In the proper exercise of police powers the right to use the property may be limited without compensation. *City of Shively v. Illinois Central Railroad Co.*, Ky., 349 S.W.2d 682 (1961); *Pennsylvania Coal Company v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

We must concern ourselves with the announced legislative purpose.

The beauty of the Cumberland River is something wonderful to behold. To a large extent God's handiwork remains yet unscarred by the greed of man. Wildlife remains in abundance. Deer, raccoons, rabbits, opossums, skunks, foxes, and squirrels are a common sight. The call of the wild turkey and the swirl of grouse and quail are often heard. Virgin timber reaches skyward to such heights that the squirrels nestled in the upper branches are safe from the hunter's gun. The wild ferns, the mayapple blossoms, the rhododendrons, the laurel, the redwood, and the dogwood trees yet abound free from the blade of the miner. This is what the legislature proposed to preserve for posterity, and this is what the Commonwealth is seeking to do in this action.

The circuit judge found that the question to be resolved is twofold:

(1) Is the Kentucky Wild Rivers Act constitutional, and

(2) If it is, may the Commonwealth, by injunctive process, constitutionally deprive the owners of the use of their property without just compensation?

The Commonwealth contends that the Act is an exercise of the state police powers and, as such, is constitutional even though no compensation is made to the property owners for interference with their right to the use of their property. The property owners vigorously disagree with the contention that the Act is an exercise of police powers; however, they do agree with the Commonwealth that the Act is constitutional. They argue that since the Act is constitutional the Commonwealth must pay for what it takes. The trial court held the Act

to be constitutional and directed the Attorney General to proceed to compensate the landowners for the rights to their real property which the Commonwealth had attempted to take.

No one contests, and it is beyond cavil that the General Assembly was interested in preserving some of our streams in their natural condition because of their scenic, scientific, and aesthetic values. In order to do that, the secretary for the Department for Natural Resources and Environment Protection is authorized to acquire within the boundaries of the designated stream area, as authorized by statute and established by the secretary, the fee simple title to, a scenic easement on, or any acceptable lesser interest in any lands. The acquisition may be by the exercise of the rights of eminent domain, by grant, by gift, by devise, or otherwise. (KRS 146.280). Thus, the General Assembly has set up a method and program for carrying out the pronounced purpose. Being cognizant of the constitutional limitation on the taking of any interest in property without first paying for it, the General Assembly provided in the Act that "Nothing in KRS 146.200 to 146.350 shall be construed to deprive a landowner of his property or any interest or right therein without just compensation." (KRS 146.280). Clear, concise, straight, and to the point! The legislature said that the state may take a person's property, but when it does it must pay for what it takes.

After analyzing the issues, we believe the answer to the dilemma confronting the parties lies in a determination of whether the Act is self-executing or is merely enabling legislation. If it is self-executing, then the legislature itself has made a taking, has designated the land use, and has attempted to provide for deferred payment. On the other hand, if the Act is enabling legislation only, we must examine the Act itself to ascertain the methods or programs by which the goal which the legislature sought to accomplish may be accomplished.

In *Pennsylvania Coal Company v. Mahon*, supra, the question presented was whether the police power of the state could be

stretched so as to destroy previously existing rights of property and contract. The Supreme Court of Pennsylvania held in the affirmative. The Supreme Court of the United States reversed. In discussing the issue, that court said:

"The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. * * * We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. * * * "

These rights we hold inviolate, and we must not hesitate to say so.

The General Assembly has provided that the Wild Rivers system shall be administered by the Department for Natural Resources and Environmental Protection according to the policies and criteria set forth in the Act. (KRS 146.270). It further clothed the secretary for the department with authority to adopt rules or regulations necessary for the preservation and enhancement of the stream areas and for the control of recreational, educational, scientific, and other uses of these areas in a manner that shall not impair them. (KRS 146.270). As standards for uniformity in the uses of the lands "within the exterior boundaries of a designated stream area," after designation by the secretary according to the terms of the Act, the General Assembly provided that (1) no new roads or buildings shall be constructed; (2) utility lines or pipelines shall not be constructed unless approved by the secretary in writing and under provision that the affected land shall be restored as nearly as possible to its former state; (3) there shall be no mining; (4) select cutting of timber shall be allowed only pursuant to regulations issued by the secretary; (5) all land disturbances, including instream disturbances such as dredging, shall be prohibited; (6) except for the management agency, access shall be by foot, horseback, canoe, boat, or other non-mechanical modes of transportation; and (7) if there are existing

agricultural areas within the boundaries of the area, such areas may continue to be used for agricultural purposes. (KRS 146.-290).

■ We hold the act to be enabling legislation and, as such, the Commonwealth is required by Section 13 of the Kentucky Constitution to pay for what it takes before the taking. *Goodwin v. Goodwin's Executor*, Ky., 290 S.W.2d 458 (1956). To hold that the Act is self-executing would violate Section 13 of the Kentucky Constitution, notwithstanding KRS 146.290.

KRS 146.240 designates eight streams which are included in the Wild Rivers system. Subsection (1) of this statute is the stream area about which the action is centered. There is absolutely no way possible to designate with any degree of accuracy the boundaries of this area because the statute does not describe them. Realizing this shortcoming, we are aided by certain standards other than those set out in KRS 146.290. The criteria for the selection of streams to be included in the Wild Rivers system are set out in KRS 146.230. The boundaries of the streams are to be established pursuant to the provisions of KRS 146.250. It would be folly to contend that the area designated by KRS 146.240 constitutes the protected region. As far as the subject area is concerned, the only protection that KRS 146.240 gives is of the Cumberland River itself. It does not include any area of land on either side of the river. To facilitate the purpose of the Act, the secretary of the Department for Natural Resources is required to establish the boundaries of the protected area. In doing so, the secretary is directed by KRS 146.250 that the "Establishment of these boundaries shall be accomplished in such a way that it includes at least the visual horizon from the stream, but not more than two thousand five hundred (2,500) feet from the center of the stream. The boundary shall further include access points, at the upstream and downstream boundary of the area." The distance from the center of the stream was reduced to 2,000 feet by the 1976 amendment to the Act.

■ The court is advised that the secretary for the Department for Natural Resources has not as yet determined the boundaries of the stream area of the location with which we are concerned, even though he was directed to make the designation by June 16, 1974. Is the validity of the Act and its enforcement dependent upon the designation's having been made by June 16, 1974? The 1976 amendment to KRS 146.250 reiterated the requirement that the designation be made by June 16, 1974, even though that date had passed. We are of the opinion that the provision for the designation of the boundaries of the area is mandatory, but the date for the making of the designation is directory. It is not necessary in the determination of the issues here presented that we decide, and we do not decide, within what period of time this designation must be made. Since the designation has not been made, how then is the trial court or this court justified in determining that the location at which the landowners propose to cut trees or disturb the area is within the boundaries of a designated stream area? The stream area has not been designated. Argumentative it may be that ten feet of the landowners' property would be within the boundaries; it may be that 100 feet would be thus located; it may be that all of the property would be in the area; or it may be that none of the property would be within the boundaries of the designated stream area. Until the stream area is designated, this is an unknown element, and there can be no violation of the Act until the stream area is designated.

The landowners' motion to dismiss called to the trial court's attention the fact that no boundary designation had been made, but to no avail. We are of the opinion that the motion was well taken; it should have been granted and the complaint should have been dismissed.

■ Next, we turn our attention to appeal No. 75–1177, which is from the order of November 3, 1975, holding the Commonwealth in contempt. By the terms of this order, the trial judge found the plaintiffs to be in contempt of court. The order was based upon the court's finding that the Commonwealth had failed to comply with its final order and judgment dated August 27, 1975. That judgment had been appealed to the Court of Appeals of Kentucky. On September 23, 1975, the Commonwealth filed its notice of appeal, and on November 1, 1975, filed its designation of record. So, at the time the trial court held the Commonwealth in contempt (November 3, 1975), the final judgment (August 27, 1975) had already been appealed. Furthermore, in the order holding the Commonwealth in contempt, the court directed that the contempt order not become effective until November 13, 1975, in order to permit the Commonwealth to appeal. Although the Commonwealth had not appealed the contempt order by November 13, 1975, it did file its notice of appeal on November 25, 1975, and that matter is presently before this court.

On November 6, 1975, the Commonwealth filed an original action in this court unsuccessfully seeking to prohibit the judge of the Franklin Circuit Court from enforcing the contempt order. *Commonwealth of Kentucky ex rel. Department for Natural Resources v. Williams*, Ky., 536 S.W.2d 474 (rendered May 7, 1976). We are of the opinion that the Commonwealth was pursuing a good faith effort toward presenting the contested issues to this court and that such conduct did not amount to a contempt of the order of the Franklin Circuit Court.

■ So much of the judgment of the Franklin Circuit Court as holds the Kentucky Wild Rivers Act constitutional is affirmed; in all other respects the judgment and the order of November 3, 1975, are reversed for proceedings consistent with this opinion.

All concur, except JONES, J., who dissents.

PALMORE, J., files a separate concurring opinion, in which REED, C. J., and STEPHENSON, J., join.

JONES, J., files a dissenting opinion.

PALMORE, Justice (concurring).

The "wildest" aspect of this controversy involving the "Wild Rivers Act" is that a suit was brought to enjoin a violation of the act within a geographic area that has never been defined as required by KRS 146.250. Technically that should end the matter and obviate the rest of the discussion. What the majority opinion does, however, is to provide some future guidance by pointing out these things:

(1) The restrictions contained in KRS 146.290, though probably intended to become effective upon designation of the boundaries pursuant to KRS 146.250, so substantially reduce the owners' private property rights that they (the restrictions) exceed the traditional scope of the police power and therefore cannot take effect unless and until the owners are paid just compensation for the loss of those rights.

(2) This being so, there can be no injunctive relief until the extinction of the owners' rights is accomplished, either through negotiated conveyance or eminent domain. Since our Constitution, Sec. 13, requires payment in advance of the taking, it is impossible for injunctive relief to be granted either before or simultaneously with the commencement of a condemnation proceeding.

Elaborating on these points, I would add that if the restrictions provided by KRS 146.290 were immediately effective under the police power, there would be nothing for the state to acquire by condemnation unless perhaps it wished to acquire full ownership of the property (erroneously described in KRS 146.280 as "fee title"). That is the real anomaly in the judgment entered by the trial court. It is an example of legal schizophrenia, saying in effect that the restrictions are in force and are protectable by injunction, but the state must nevertheless go on with a condemnation proceeding. As mentioned above, however, if the restrictions are in force, and if that is all the state wants, there is nothing for it to acquire in a condemnation proceeding.

It is a matter of deep regret to me that we cannot uphold the right of the state to "freeze" the use of these wild rivers areas without having to incur the expense of compensating the private owners. Nevertheless, having searched the authorities elsewhere[1] to make certain that we are not being unnecessarily conservative in our estimation of the police power, I believe that if we held otherwise the United States Supreme Court would declare the effect of KRS 146.290 to be a taking of property without due process of law. And, after all, if the state can simply extinguish one's right to mine, cut timber or put buildings on land that has no real value for any other private purpose, what can the due process clause mean? Private ownership of property is fundamental to our system, and if the system is to be changed it should not be changed by the courts.

One last note which may seem trivial: I do not understand why the drafters of statutes persist in using the term "fee simple" or "fee title" to distinguish corporeal from incorporeal rights. "Fee simple" measures title in terms of time, meaning forever. It is equally applicable to corporeal title and to easements, which, being rights to use as distinguished from the right to possess and exercise general dominion over the property in question, are called incorporeal. I simply deplore the continuing bastardization of a great and rich language. Of all people, lawyers should know better.

REED, C. J., and STEPHENSON, J., join in this concurring opinion.

JONES, Justice (dissenting).

I respectfully, but vigorously dissent from the majority opinion for reasons enumerated in the dissent.

---

1. Various "wetlands" acts prohibiting the dredging and filling of marsh lands provide the closest comparison. There, however, there is nothing much the owner can do with the property in its present state, whereas land that already is rich in timber and minerals and desirable for residential and recreational development has great value "as is" and now.

I agree that the enactment of the Kentucky Wild Rivers Act[1] by the General Assembly at its 1972 session served a laudable purpose. The legislative scheme of preserving the unique primitive character of the Wild Rivers area for all the citizens of the Commonwealth is commendable. It is pleasant,

"To him who in the love of
  Nature holds
  Communion with her visible
  Forms, she speaks
  A various language."[2]

It refreshes one's spirit to tread the forest primeval; to see and hear the murmuring pines and the hemlocks bearded with moss, and in garments green. To hear and see the cascading waters of Cumberland Falls in its picturesque setting is an experience that lingers long in memory.

The legislative scheme to preserve the beauty in the designated areas was never intended to be accomplished by imposing the burden of the cost and a restriction of use on the owners of property within the designated area. A comprehensive study of provisions of the act reveals no ambiguities. The purpose, intent, regulation and enforcement of the provisions are detailed in clear, concise and simple language.

It would be repetitious to detail every procedure—every step taken in this continuing controversy of two years' duration. The Kentucky Wild Rivers Act became effective over four years ago. Almost two years have passed since the trial court issued a restraining order prohibiting Morris Stephens from ". . . cutting timber, road building, and any other land uses allowed by KRS 146.290 within the exterior boundaries designated by KRS Ch. 146 as a wild river, that section being the Cumberland and River from Summer Shoals to the backwater of Lake Cumberland, and the defendant's [Stephens] activities being within the section approximately 300 feet upstream from Cumberland Falls on the west bank of the Cumberland River in McCreary County, Kentucky. . . ." Subsequently, the Commonwealth was granted a temporary injunction with the same effect as the restraining order. Since December 10, 1974, that injunction has been in full force and effect. Out of the "tangled morass" of legal procedure has emerged a scheme by the Commonwealth to take private property for public use without just compensation. That concept violates both the United States Constitution[3] and the Kentucky Constitution.[4]

The majority construes the Wild Rivers Act as enabling legislation. My view is to the contrary. I am convinced that on June 16, 1972, when the act became effective, Morris Stephens and other property owners within the designated area were restricted in the use of their property. There was a taking. There was, "an interference with the legally protected use to which the land has been dedicated, which destroys that use or places a substantial and additional burden on the landowner to maintain that use is a 'taking' of his property."[5] Since the act became effective more than four years ago, Morris Stephens cannot pluck a wild flower, cut a "riding switch," lift a stone, or construct a passway on his property. There has been such substantial interference by the Commonwealth so as to destroy his right to the use and enjoyment of his property. A portion of the act designated that:

". . . [e]stablishment of these boundaries shall be accomplished in such a way that it includes at least the visual horizon from the stream, but not more than two thousand five hundred (2,500)

1. The Kentucky Wild Rivers Act referred to is KRS 146.200 through 146.990.

2. Bryant, *Thanatopsis.*

3. The fifth amendment provides, ". . . nor shall private property be taken for public use without just compensation."

4. Section 242 of the Kentucky Constitution provides that any person or corporation who has, "the privilege of taking private property for public use, shall make just compensation for property taken, injured or destroyed by them; *which compensation shall be paid before such taking.*" (Emphasis added)

5. *Commonwealth v. Kelley,* 314 Ky. 581, 236 S.W.2d 695 (1951)

feet from the center of the stream. The boundary shall further include access points, at the upstream and downstream boundary of the area."

The fact that the Commonwealth has failed to comply with the legislative intent is irrelevant. A dereliction of duty is not sufficient to erase the restriction—the taking of private property without just compensation.

I am convinced that in order to conform to the purpose and legislative intent of the Wild Rivers Act, the protection embodied in the act was to be extended to all streams designated from the moment that the act became effective. When the legislature designated that portion of the Cumberland River which is in dispute here, as part of the Wild Rivers System, all development not in accord with KRS 146.290 was then prohibited.

I am buttressed in my view by that portion of the majority opinion that holds:

"The landowners' motion to dismiss called to the trial court's attention the fact that no boundary designation had been made, but to no avail. We are of the opinion that the motion was well taken; it should have been granted and the complaint should have been dismissed."

Had the complaint been dismissed there would have been nothing to prevent a multiplicity of actions seeking a solution to the questions before the trial court in this action.

However, since the majority takes the position that it is not the purpose of injunctions to determine substantive rights as regards a landowner, but is alright for the Commonwealth, that concept is difficult to swallow. What is "sauce for the goose is sauce for the gander." If the Commonwealth could restrict the landowner's use of his property, why should it not have been required to pay for the taking?

I am not impressed with the majority's view that the Commonwealth was in good faith pursuing anything. All the Commonwealth desires is relief from the order adjudging it in contempt. The Common-

wealth has flagrantly, openly and notoriously violated the trial court's order. Then, it asserts:

"To penalize this party [the Commonwealth] from what is clearly, at worst, excusable error would contradict the clear intent of our judicial system to provide justice tempered by fairness. . . ."

For the Commonwealth to state that Morris Stephens has suffered no real harm as a result of the Commonwealth's actions is absurd. In fairness it should not have been so asserted.

As we celebrate this bicentennial year, may we follow the precepts of good faith and integrity established by the founding fathers. Let us remember that no one, including the sovereign, is above the law. It is the duty of a governmental department to obey an injunction.[6] A court's order would be an exercise in futility if this were not so.

The trial court held that, ". . . when an injunctive procedure which will deprive the land owner of any rights to his property, is instituted the Commonwealth should *forthwith* initiate proceedings to compensate therefore either by negotiation or condemnation." In substance, the trial court told the Commonwealth to "fish" or "cut bait." Yet, it has done nothing to comply with the trial court's judgment and order.

The trial court properly resolved the issues in accordance with the provisions of the act. He made proper findings that in my view are not clearly erroneous. CR 52.01.

For the reasons set out in this dissent, I would affirm the judgment of the trial court.

6. *Wallace v. Sowards, Judge,* 313 Ky. 360, 231 S.W.2d 10 (1951).