**Randall L. STATHERS and Bobbie Stathers, His Wife; and Brandalyn Elkins, Appellants**

v.

**GARRARD COUNTY BOARD OF EDUCATION; Branscum Construction Company, Inc.; Elza Construction, LLC; Impact Drilling & Blasting, Inc.; and Irvine and Pyles Drilling Company, Inc., Appellees.**

**Garrard County Board of Education; Branscum Construction Company, Inc.; and Elza Construction, LLC, Cross–Appellants**

v.

**Randall L. Stathers and Bobbie Stathers, His Wife; and Brandalyn Elkins, Cross–Appellees.**

Nos. 2010–CA–002212–MR, 2010–CA–002281–MR.

Court of Appeals of Kentucky.

Aug. 31, 2012.

Rehearing Denied Oct. 29, 2012.

Discretionary Review Denied by Supreme Court Aug. 21, 2013.

Whitney Dunlap, III (argued), Michael S. Fore, Richmond, KY, for appellees/cross-appellants, Garrard County Board Of Education; Branscum Construction Company, Inc.; and Elza Construction, LLC.

Before ACREE, Chief Judge; MOORE and VANMETER, Judges.

## OPINION

ACREE, Chief Judge:

Randall and Bobbie Stathers, and Brandalyn Elkins appeal the Garrard Circuit Court's November 8, 2010 order granting summary judgment in favor of appellees Garrard County Board of Education (Board), Branscum Construction Company, Inc. (Branscum), Elza Construction, LLC (Elza), Impact Drilling & Blasting, Inc.,[1] and Irvine and Pyles Drilling Company, Inc. (Irvine and Pyles). The circuit court found that the Stathers and Elkins failed to present sufficient evidence that blasting by the appellees caused damage to their respective homes.

The Board, Branscum, and Elza cross-appeal the circuit court's June 7, 2010 order finding that the Board is not entitled to governmental immunity and, in turn, denying the Board's motion to dismiss.

For the reasons that follow, we reverse as to the appeal, affirm as to the cross-appeal, and remand for additional proceedings.

## I. Facts and Procedure

In June 2007, the Board entered into a contract with Branscum to build a new high school building in Lancaster, Kentucky. To aid in the construction, Branscum hired Elza to serve as the project's

Gerry L. Calvert (argued), II, Lexington, KY, J. Paul Long, Jr., Stanford, KY, for appellants/cross-appellees.

Evan B. Jones (argued), John G. McNeill, Lexington, KY, for appellee, Irvine and Pyles Drilling Company, Inc.

1. While named as a defendant and, subsequently, an appellee, Impact Drilling and Blasting, Inc., does not appear to have participated in the circuit court action nor has it filed a brief to this Court.

general contractor. Elza then subcontracted with Irvine and Pyles to complete specialized blasting work at the school construction site.

Randall and Bobbie Stathers, husband and wife, reside approximately one-half mile from the construction site. Brandalyn Elkins is the Stathers' next-door neighbor.

From August 2007 through June 2008, blasting regularly occurred at the construction site. The blasting caused the Appellants' houses to shake and rattle. Within weeks of the start of the blasting, the Appellants noticed interior and exterior cracks developing in their homes, and doors were no longer shutting properly.

In the fall of 2008, the Stathers and Elkins filed separate yet virtually identical complaints against the Appellees, alleging they engaged in the ultra-hazardous activity of blasting at the construction site which produced violent concussions and vibrations resulting in significant damage to the Appellants' residences.[2] On October 6, 2008, the circuit court ordered the two lawsuits consolidated.

In January 2009, the parties began discovery; both the Stathers and Elkins were deposed.

During his deposition, Randall Stathers testified his house was built in 1958 and was originally owned by his grandfather. Randall explained that as a child he "ate Sunday dinner there every Sunday" and even "lived there for a couple of years." Randall could not recall "any kind of remodeling or any kind of major construction or repairs or changes to the house" when it was owned by his grandfather. Upon purchasing the house in 2004, Randall tes-

tified he was not aware of any settling or stress cracks in the house.

Randall explained that, in the fall of 2007, he was "leaving early in the morning and getting home late at night" so he was not home when most of the blasting occurred. However, Randall recalled feeling blasts on days when he was home early. In all, Randall testified he felt "two pretty good [blasts] and two or three slight [blasts]." During one of the large blasts, Randall claimed the "house shook quite violently."

Barbara Stathers testified that, unlike Randall, she was home daily and often felt the house shake as a result of the blasting. Barbara testified that, starting in August 2007, she "could feel the house move whenever there was blasting." Barbara explained: "I mean, you could hear it and the floors shook and the windows.... Anytime there was blasting, you could feel it. You know, if you stand on the floors, you could feel the floors move." Barbara recalled a particularly big blast that occurred on October 10, 2007, which she "could really hear" and that "really shook" the house; a similar "huge blast" occurred on October 22, 2007. In all, Barbara testified she felt blasts on approximately thirty-seven days between August 2007 and June 2008.

Like Randall, Barbara did not recall any cracks or damage to the interior or exterior of the house prior to the fall of 2007. On or about October 15, 2007, Barbara's insurance agent advised her to begin inspecting the house for damage. Upon doing so, Barbara discovered interior and exterior cracking. Randall confirmed Barbara's testimony, adding the cracks "were more noticeable after some of the big shocks" and he "kept noticing more dam-

---

2. Initially, the Appellants named only the Board and Branscum as defendants. However, through a series of amended complaints, the Appellants joined Elza, Impact Drilling, and Irvine and Pyles as defendants.

age" as time, and the blasting, progressed. Barbara also testified, prior to the blasting, both the back storm door and the living closet door shut but, starting in the fall of 2007, neither door would shut properly.

During Elkins deposition, she testified she purchased her house in 2003, and when she moved in, she personally removed all the wallpaper in the house and repainted every room with the exception of one. During this process, Elkins obtained "a good view of all of the walls" and observed no cracks or evidence of cracking, patchwork, or repairs. Similarly, a pre-purchase inspection of her home—required by her mortgage lender and conducted by a neutral third party—revealed only one pre-existing crack in the exterior brick veneer that the previous homeowner had repaired.

Elkins testified that, as an employee of the Garrard County Board of Education, she was aware of the construction project "from way back." However, because Elkins worked full-time, she was often not home when the blasting occurred. Once the school year ended, Elkins felt blasts shake her house on May 28, 2008, May 29, 2008, and June 11, 2008.

Elkins began noticing damage to her house in September of 2007: "the first thing I noticed was my back door wasn't shutting properly. It seemed to be off—I don't know the correct word. It wasn't lining up to shut properly. And then I started noticing more cracks, small, and then they would get larger, and just over time, over several months, everything just got progressively worse and it continues to get progressively worse." Elkins testified that, as of 2009, there was "damage[ ] in every room of [her] house." Elkins explained:

there is no room that does not have a crack in it. Every room, even inside the closets there are cracks in my house. . . . There's some wall cracks, there's some ceiling cracks. There are lots of cracks that go from the windows on up to the ceiling or the windows down to the floor or the door jamb up to the ceiling. It's just—there's no room exclusive of cracks.

Elkins testified the house "was built in 1957" and "there were no ceiling cracks or wall cracks like this in the house at the time that [she] bought the house in 2003."

Following the taking of the Appellants' depositions, Irvine and Pyles moved for summary judgment claiming the record was void of any evidence establishing the blasting at the construction site caused the damage to the Appellants' homes. The Board, Branscum, and Elza quickly joined the motion. The Appellants responded to the summary judgment motion with two initial reports—one regarding each house—from Joseph Poage, a licensed structural engineer.

With respect to the Stathers' home, Poage discovered exterior cracks that "did not appear to be recent" and "surface cracks around the perimeter that had been patched in the past." However, Poage also discovered interior cracks in the ceiling and walls as well as recent exterior cracks; Poage opined the cracks "could have been caused by the earth's vibration resulting in earth movement." Poage explained that "vibration can affect the bearing material under footing which in turn results in settlement." Poage opined that "ground motion caused foundation settlement [resulting in] the damage to the house" but explained it was imperative to obtain the relevant blasting records.

Regarding the Elkins' home, Poage discovered "extensive cracks in the foundation and the interior dry-wall" that ap-

peared "fresh." [3] Poage concluded, based on his inspection, "that vibration caused the interior cracks in the ceilings and walls ... due to low particle velocity of low range cycling level of the earth vibration transferred through the foundation conditions." Poage again requested the relevant blasting records.

By order dated March 16, 2010, the circuit court denied Irvine and Pyles' motion and ordered the Appellants to produce their final expert reports. In compliance, the Appellants provided subsequent written reports from Poage dated March 1, 2010 and April 15, 2010. In the March 1, 2010 report, Poage opined that "[t]he cracking of the brick veneer on [Elkins'] house appears to have occurred due to vibration." Further, in the April 15, 2010 report—which discussed both houses— Poage acknowledged the blasting records revealed the blasting at the construction site "appears to be below state requirements" but then questioned the accuracy of that information. Poage reiterated that "hair line cracks as well as open mortar joints in brick and block masonry" found on the Stathers' home "can be caused by vibration." Poage also confirmed that Elkins' house had "plaster crack associated with vibration that are throughout rooms on the side where the blasting occurred" as well as cracks in the exterior brick veneer that "could have been caused by low level vibration due to particle velocity. From all indications the blasting at the Garrard County High School lasted over two years; from 2007 through 2008 and into 2009."

On May 27, 2010, Irvine and Pyles renewed its motion for summary judgment claiming Poage's subsequent reports again failed to connect the blasting at the con-

struction site to the Appellants' foundation and plaster crack complaints. The Board, Branscum, and Elza joined Irvine and Pyles' renewed motion.

On November 8, 2010, the circuit court entered summary judgment in the Appellees' favor and dismissed the Appellants' claims. In so doing, the circuit court reasoned that Poage's reports "speculate as to the cause of the wall and ceiling cracking in the [Appellants'] homes, but [Poage] does not give an opinion within any degree of probability that any of the [Appellants'] complaints were caused by the blasting or construction activities of the [Appellees]." The circuit court further explained "[t]he deposition testimony of record is also void of any eyewitness testimony which would connect any particular blasting event to any item of damage." This appeal followed.

## II. *Standard of Review*

Our task in reviewing a grant of summary judgment is to determine whether the circuit court correctly found no genuine issue exists as to any material facts and whether, based on such facts, appellee is entitled to judgment as a matter of law. *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App.1996). When reviewing a summary judgment order, only legal questions and the existence, or non-existence, of material facts are considered. *Id.* Therefore, a grant of summary judgment is reviewed *de novo.* *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436 (Ky.App.2001). With this standard in mind, we turn to the case before us.

## III. *The Parties' Arguments*

Appellants contend the circuit court erred in granting summary judgment on

---

**3.** Poage clarified in his opinion letter that some of the exterior cracks "appeared to be more associated with thermal changes caus-

ing expansion and contraction rather than vibration."

the ground that they failed to establish a causal connection between the blasting at the construction site and the damage to their houses. The Appellants' position is twofold: First, the Appellants aver Poage's expert opinions did, in fact, establish the Appellees' blasting was the cause of the damage to the Appellants' homes. Second, in the event this Court finds otherwise, Appellants maintain expert testimony is not needed to establish causation in a blasting damages case, and the Appellants' deposition testimony, in and of itself, provides ample evidence connecting the blasting with their resulting damage.

In response, the Appellees assert the Appellants failed to produce sufficient proof—through expert testimony or otherwise—beyond mere speculation, demonstrating any reasonable probability that the blasting by the Appellees caused the damage alleged by the Appellants. As a result, the Appellees contend, no genuine issue of material fact exists as to causation and summary judgment was proper.

## IV. *Analysis*

This is a blasting case and, therefore, a strict liability case. *See Island Creek Coal Co. v. Rodgers,* 644 S.W.2d 339, 348 (Ky. App.1982) ("Kentucky has expressly renounced the 'negligence' theory in blasting cases."); David J. Leibson, 13 Ky. Prac. Tort Law § 12:6 (2011) ("Blasting is an activity which has repeatedly been held

subject to strict liability."). Under a blasting strict liability analysis, proof of causation between the blasting and the claimed property damage is required. *Holbrook v. Rose,* 458 S.W.2d 155, 157 (Ky.1970) (noting "one common denominator" between strict liability and similar tort-based causes of action is the need to establish causation); *Island Creek Coal,* 644 S.W.2d at 348 (explaining it is only necessary to prove causation and damages in blasting strict liability cases); *Wolf Creek Collieries Co. v. Davis,* 441 S.W.2d 401, 402–03 (Ky. App.1969). The Appellants must therefore show a genuine issue of material fact exists as to causation to maintain their strict liability claim and survive summary judgment. We think they have.

■■■■ We begin by noting that "causation ... presents a mixed question of law and fact." *Pathways, Inc. v. Hammons,* 113 S.W.3d 85, 89 (Ky.2003) (citing *Deutsch v. Shein,* 597 S.W.2d 141, 145 (Ky.1980)). Therefore, whether a plaintiff's damage was caused by the tort defendant typically "should be left to the jury to determine." *Eichstadt v. Underwood,* 337 S.W.2d 684, 686 (Ky.1960) (reviewing denial of defendant's directed verdict motion). It is not surprising then that, with the exception of medical malpractice cases,[4] we could find no Kentucky appellate opinion affirming any grant of summary judgment based on a plaintiff's inability to establish, through expert testimony, the existence of

---

4. "Under Kentucky law, a plaintiff alleging medical malpractice is generally required to put forth expert testimony to show that the defendant medical provider failed to conform to the standard of care." *Blankenship v. Collier,* 302 S.W.3d 665, 670 (Ky.2010) (citation omitted). "When it is evident that the plaintiff has not secured a single expert witness and has failed to make any expert disclosures after a reasonable period of time, there truly is a failure of proof and a summary judgment motion is appropriate." *Id.* at 674. This rule has never been applied to a blasting case and,

to our understanding, has never been applied to any case other than medical malpractice cases. Even in these cases, summary judgment is not granted for lack of proof of causation; summary judgment is granted because there was no proof of the standard of care (*i.e.,* the measure of the duty) and, therefore, no proof of a breach. *Id.* (Plaintiff "never created a genuine issue of material fact regarding [defendant physician's] negligence by identifying a medical expert who could testify about a breach of the standard of care.").

a genuine issue of the material fact—in this case, a genuine issue regarding causation.

■ Despite our inability to locate such a case, we acknowledge that there is an exception to this general rule. That exception is where it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky.1991) (citing *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255 (Ky.1985)). The word "impossible" in the context of the summary judgment standard is to be "used in a practical sense, not in an absolute sense." *Perkins v. Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992). As we explain, we do not believe it is a practical impossibility that Appellants will be able to produce evidence at trial warranting a judgment in their favor.

■ We begin, however, by noting the gravamen of the circuit court's order granting summary judgment in favor of the Appellees—that the Appellants failed to offer any expert testimony that opines, within a reasonable degree of engineering probability, that the blasting at the construction site caused the damage sustained. The Appellants maintain there is no requirement that a plaintiff in a blasting case produce any expert testimony to establish causation. We are persuaded by Appellants' analysis.

Appellants direct our attention to a line of cases addressing, in part, whether the plaintiffs' blasting claims could get as far as the jury on the issue of causation, even absent supporting expert testimony of causation. *See, e.g., River Queen Coal Co. v. Mencer*, 379 S.W.2d 461, 463–64 (Ky.1964); *Security Fire & Indem. Co. v. Hughes*, 383 S.W.2d 113 (Ky.1964); and *Bradford v. Sagraves*, 556 S.W.2d 166, 167–69 (Ky.App. 1977). All of the cases cited here, and more, conclude that they could. Because

each of these cases affirms a trial court's denial of a directed verdict motion based on the plaintiff's failure to present expert testimony, it would be absurd to conclude that expert testimony is required to survive a summary judgment motion. *River Queen* is representative of the analysis in these directed verdict cases.

In *River Queen*, the plaintiffs testified that, after the defendant commenced blasting operations approximately one-and-one-half miles from their home, their "house was often severely shaken and they observed cracks which became progressively worse." 379 S.W.2d at 463. The plaintiffs "testified to feeling the vibrations from the blasting, hearing the dishes and windows rattle, and to the physical damage to the house which immediately ensued" after the blasting started. *Id.* However, seismologists testifying on the defendant's behalf claimed, under the circumstances, "it was a physical impossibility for [the plaintiffs'] house to have been damaged by either vibrations or concussions emanating from the charges set off by" the defendant. *Id.*

On appeal, Kentucky's highest court concluded "there was enough evidence to take the [plaintiffs'] case to the jury despite [the defendant's] abundant expert testimony that the [plaintiffs'] home was too far away to be affected by the blasting." In so concluding, the Court reasoned that,

[a]lthough the experts' testimony in the case at bar is strong, we cannot say that it is conclusive—that the defense was entitled to a directed verdict on the theory that the damage to the [plaintiffs'] home just could not have been caused by the blasting as a scientific fact. Were we to take such a view, we would be requiring a complainant to prove his case scientifically rather than by the law's old established standard of proba-

ble cause. We do not find the testimony of the [plaintiffs] as to the damage following the blasts as so inherently incredible or contrary to the laws of nature as to justify directing a verdict for [the defendant].

*Id.* at 464. The cases of *Security Fire & Indem. Co. v. Hughes* and *Bradford v. Sagraves* present the same analysis and reach the same holding.

■ In sum, *River Queen, Hughes,* and *Bradford* instruct that a court should not discount relevant lay testimony in ascertaining whether there is a causal connection between a defendant's blasting and the complaining plaintiff's damages; furthermore, lay testimony, even in the absence of supporting expert testimony, may be sufficient to create a genuine issue of material fact that must be determined by a jury. Accordingly, we reject the Appellees' position that the "Appellants must put forth some expert testimony connecting the blasting at the high school to their complaints of cracked walls, ceilings, and foundations." (Appellee Irvine and Pyles' Brief at 14).

■ The question then becomes whether, despite Appellants' presentation of lay and expert testimony, and the reasonable inferences therefrom, it is still impossible, in a practical sense, for them to prevail at trial. Examining the record "in a light most favorable to the party opposing the motion for summary judgment and [resolving] all doubts ... in his favor[,]" *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 480 (Ky.1991), we believe it is not impossible for a jury to rule for Appellants on their claims against Appellees.

We believe Appellants produced sufficient evidence on the issue of causation to survive the Appellees' motion for summary judgment. We can discern no meaningful distinction between the proof that survived directed verdict motions in *River Queen,*

*Hughes,* and *Bradford,* and the proffer of evidence in this case that failed to survive summary judgment motion.

First, the depositions of the Stathers and Elkins provide ample evidence concerning the condition of both houses before the blasting began. Significantly, neither the Stathers nor Elkins observed interior or exterior cracks prior to the fall of 2007. *See Bradford,* 556 S.W.2d at 167 (noting, prior to the blasting, no damage or defect was apparent in the plaintiff's home).

Second, similar to the plaintiffs in *River Queen, Bradford,* and *Hughes,* Barbara and Randall both gave graphic descriptions of the blasting and the corresponding vibrations and effects. Barbara explained, when the blasts occurred, the house shook, the windows rattled, and the floors moved. Randall testified as to one blast which he claimed violently shook the house. Further, while Elkins was not home when many of the blasts occurred, she testified to feeling three blasts in May and June of 2008 when she was.

Third, after the blasts began, both the Stathers and Elkins observed significant changes to the condition of their homes compared to the houses' conditions immediately before blasting began. Specifically, as in *River Queen,* the Appellants testified they observed interior and exterior cracks which became progressively worse, and discovered doors would no longer shut properly. *River Queen,* 379 S.W.2d at 463. It is reasonable for a fact-finder to infer that these considerable changes, observed over a short period of time in homes over fifty years old, were not likely to have been caused by natural forces. *See Hughes,* 383 S.W.2d at 113 (noting the plaintiff testified that damage to his house, which he first noticed after the blasting began, "occurred during the three months of the blasting operations").

Fourth, while expert testimony is not required to establish causation in blasting strict liability cases, it does not bar a plaintiff from using such testimony to bolster his or her case. *See Prater Creek Processing Co. v. McClanahan,* 741 S.W.2d 278, 278–79 (Ky.App.1987) (finding the combination of lay testimony concerning the intensity of the vibrations and resulting damage, and expert testimony explaining the plaintiffs' damage was consistent with vibrational blasting, sufficient to submit the matter to a jury); *Valley Stone Co. v. Binion,* 422 S.W.2d 889, 890 (Ky.App.1968). Here, the Appellants submitted several opinions provided by Poage, a licensed structural engineer, justifying the reasonable inference connecting the blasting to the damage sustained.[5] Poage opined that ground motion caused foundation settlement resulting in the damage to the Stathers' home, and earth vibrations caused the interior cracking in the ceilings and walls of Elkins' home. Poage further opined that brick cracks in Elkins' home could have been caused by low level vibration due to particle velocity. As pointed out by the Appellees, Poage often used words of limitation in expressing his opinions, such as "could" and "appeared"; however, we do not find this fatal to Appellants' case. *See Binion,* 422 S.W.2d at 890 (finding sufficient the plaintiffs' expert testimony that the damage sustained by the plaintiffs *"could* have been caused by some outside force" (emphasis added)). While Poage's opinions are not conclusive, in light of the intense vibrations caused by the blast-

ing—as testified to by the Appellants—a fact-finder could infer the blasting caused the damages to the Appellants' homes. We caution, however, that while we find that a jury *could* make such an inference, we are not saying that a jury *must* do so. *Commonwealth v. DeHaven,* 929 S.W.2d 187, 189 (Ky.1996) (juries draw inferences "from all the facts and circumstances in the record").

In sum, a fact-finder could reasonably conclude the blasting was the cause of damage to the Appellants' homes because of: (1) the condition of the homes observed before and after blasting commenced; (2) the temporal relationship between when the blasting vibrations occurred and when the damage was first observed; and (3) Poage's expert opinion that the damage could have been caused by earth vibrations and/or ground motion. *See Binion,* 422 S.W.2d at 890; *Prater Creek,* 741 S.W.2d at 279. Therefore, it was not impossible for Appellants to produce evidence at trial that would result in a jury verdict in their favor. We therefore reverse the circuit court's November 8, 2010 order granting summary judgment in the Appellees' favor.

We now turn to the Board's cross-appeal.

Prior to the circuit court's order granting summary judgment in favor of the Appellees, the Board moved to dismiss the Appellants' claims on the ground that the Board is entitled to governmental immunity. The Appellants opposed the motion. On June 7, 2010, the circuit court

---

5. In their brief, Irvine and Pyles contend, by virtue of the circuit court's November 8, 2010 order granting summary judgment, the circuit court "exclud[ed] the Appellants' expert from testifying" because "the Appellant's [sic] expert report did not satisfy the standards required of [*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)]." (Appellee Irvine and Pyles' Brief at 13). We find no such ruling in the circuit court's order. In fact, during the hearing on the summary judgment motion, the circuit court reiterated the matter had not yet progressed to the *Daubert* stage. Accordingly, we pass no judgment concerning whether Poage and his expert reports satisfy *Daubert.*

denied the Board's motion, explaining "[i]f [Appellants] prove their case, and if their property is damaged to the point that it destroys the use or places a substantial and additional burden on the landowner to maintain their use, there would be a 'taking' pursuant to [*Commonwealth v.*] *Kelley* [314 Ky. 581], 236 S.W.2d 695 ([Ky.]1951), and the common law principles of sovereign and governmental immunity would not apply."

The Board argues on cross-appeal that the circuit court mistakenly relied upon *Kelley,* and reiterates it is entitled to governmental immunity. We disagree.

■ As emphasized by the Board, in *Yanero v. Davis,* 65 S.W.3d 510 (Ky.2001) and *Grayson County Bd. of Educ. v. Casey,* 157 S.W.3d 201 (Ky.2005), our Supreme Court extensively discussed a school board's right to governmental immunity, explaining:

A board of education is an agency of state government and is cloaked with governmental immunity; thus, it can only be sued in a judicial court for damages caused by its tortious performance of a proprietary function, but not its tortious performance of a governmental function, unless the General Assembly has waived its immunity by statute.

*Casey,* 157 S.W.3d at 202–03; *Yanero,* 65 S.W.3d at 527. Accordingly, if a school board is engaged in a governmental function it is absolutely immune from suit unless a statutory or constitutional provision provides otherwise. *See Casey,* 157 S.W.3d at 202–03; *Yanero,* 65 S.W.3d at 527.

Armed with *Yanero* and *Casey,* the Board contends, and the Appellants do not dispute, the construction of a school building is a governmental function, as it is an activity that directly furthers education.

*See Schwindel v. Meade County,* 113 S.W.3d 159, 168 (Ky.2003) (finding "the sponsorship and conduct of an interscholastic athletic tournament by a board of education is a governmental function"); *Breathitt County Bd. of Educ. v. Prater,* 292 S.W.3d 883, 888 (Ky.2009) (concluding "the Board's provision of housing for its night watchperson was a government act in direct furtherance of its education purpose"). We agree with this analysis, thus far.

However, at this point we cannot agree with the Board's ultimate conclusion that because it was engaged in a governmental function, it is automatically entitled to governmental immunity. There is another step. Before we can agree with the Board, we must find inapplicable that "line of cases which allow recovery against the Commonwealth or a political subdivision on the ground that" compensation must be paid for injury to a plaintiff's land pursuant to sections 13 and 242 of the Kentucky Constitution. *Commonwealth, Dep't of Highways v. Cochrane,* 397 S.W.2d 155, 156 (Ky.1965).

■ In *Kentucky State Park Comm'n v. Wilder,* 260 Ky. 190, 84 S.W.2d 38 (1935), our Supreme Court explained:

Section 13 of the Constitution declares that no "man's property [shall] be taken or applied to public use without the consent of his representatives, and without just compensation being previously made to him." This declaration of an "inherent and inalienable" right has been a part of all four Constitutions of Kentucky, and there is no exception in favor of the state or its subdivisions. *Carrico v. Colvin,* 92 Ky. 342, 17 S.W. 854, 13 Ky. Law Rep. 603 [ (1891) ].

Section 242 of the Constitution requires

that municipal and other corporations[6] and individuals invested with the privilege of taking private property for public use shall pay or secure the payment of just compensation before the taking thereof. *This allows compensation for injury or destruction of property unattended by an actual taking.* Both sections prohibit the actual taking of property without payment. *Bushart v. Fulton County,* 183 Ky. 471, 209 S.W. 499 [ (1919) ].

260 Ky. at 192, 84 S.W.2d at 39 (emphasis added). "Under these express provisions," the Court later explained, "an appropriate action will lie against the commonwealth as well as against corporations or individuals for damages growing out of the taking, injuring, or destroying of private property for public purposes." *Lehman v. Williams,* 301 Ky. 729, 193 S.W.2d 161, 163 (1946).

■ Similarly, in *Perry County v. Townes,* 228 Ky. 608, 15 S.W.2d 521 (1929), the Court reasoned:

"The provision of the Constitution which requires that municipalities and other corporations taking private property for public use shall make just compensation for the property taken, injured or destroyed by them, necessarily implies that, if the corporation should fail to make the compensation before the taking or injuring, it is liable therefore after such taking or injury, and that, if it will not pay the damages, an action is neces-

sarily authorized to be instituted against it; for it would be idle to give to a party a right without a remedy to enforce it."

228 Ky. at 612, 15 S.W.2d at 523 (quoting *Layman v. Beeler,* 113 Ky. 221, 67 S.W. 995, 996, 24 Ky.L.Rptr. 174 (1902) (internal quotation marks omitted)).[7] In sum, sections 13 and 242 of the Kentucky Constitution represent a waiver of governmental sovereign immunity. *See Holloway Const. Co. v. Smith,* 683 S.W.2d 248, 249 (Ky. 1984); *Kentucky Bell Corp. v. Commonwealth,* 295 Ky. 21, 172 S.W.2d 661, 663 (1943).

■ The Board asserts, because the damage to the Appellants' homes does not rise to the level of a "taking" as defined in this Commonwealth,[8] sections 13 and 242 do not apply, and governmental immunity is not waived. We acknowledge some cases imply the damage or injury to the plaintiff's property must rise to the level of a taking. *See Curlin v. Ashby,* 264 S.W.2d 671, 672 (Ky.1954) (referencing the "line of cases which hold that where a trespass by the state amounts to a taking of property for public use, the state's immunity from suit is waived"); *Dep't of Highways v. Parker,* 306 Ky. 14, 206 S.W.2d 73, 74 (1947) ("Actions [against the Commonwealth] may be maintained under the provisions of Section 13 or Section 242 of the Constitution, which require that compensation be paid for the taking of private property for public use."); *Superior Coal &*

6. As explained in *Board of Education of Louisville v. Society of Alumni of Louisville Male High School,* 239 S.W.2d 931 (Ky.1951), "[a] local school board is a body politic [vested] with corporate powers." *Id.* at 933. To that end, "[a] school board is a quasi-municipal corporation, and is governed by rules applicable to strict municipalities." *Id.* at 934.

7. These types of cases—in which the plaintiff brings suit against the Commonwealth claiming "an unauthorized taking, destruction or

injury to their property"—are commonly referred to as inverse or "reverse condemnation" suits. *Holloway Const. Co. v. Smith,* 683 S.W.2d 248, 249 (Ky.1984).

8. A "taking" is defined as "the entering upon private property and devoting it to public use so as to deprive the owner of all beneficial enjoyment." *Martin v. Commonwealth,* 199 S.W.3d 195, 199 (Ky.App.2006) (citation omitted).

*Builders Supply Co. v. Board of Educ.*, 260 Ky. 84, 83 S.W.2d 875, 876 (1935) (reiterating that, if the Commonwealth "has taken in whole or in part the property" of the plaintiff, "it must pay therefor" pursuant to sections 13 and 242 of the Kentucky Constitution). Nevertheless, a separate, yet related, line of cases provides otherwise. *See Foster v. Sanders*, 557 S.W.2d 205, 207 (Ky.App.1977) ("In construing sections 13 and 242, this state's highest court has held that the owner must be paid or tendered compensation before his property may be 'taken' for public use. If the property is only 'injured or destroyed' rather than 'taken', the damages need only be paid or 'secured.'"); *Cochrane*, 397 S.W.2d at 156; *Jefferson County v. Bischoff*, 238 Ky. 176, 37 S.W.2d 24, 24–25 (1931); *Moore v. Lawrence*, 143 Ky. 448, 136 S.W. 1031 (1911) ("In the case at bar [the injury] is alleged to be due to the ditching of the road [by the Commonwealth] in such a manner as to discharge the accumulated water upon appellant's premises.... If this be true, appellant was injured within the meaning of section 242 of the Constitution."). We find the latter line of cases persuasive.

 As referenced, section 13 prohibits the taking of private property by the Commonwealth without just compensation. Ky. Const. § 13. The requirements of section 13 are amplified by section 242 which requires "just compensation for property taken, injured, *or* destroyed." Ky. Const. § 242 (emphasis added). The use of the word "or" implies there are three separate and distinct instances in which the Commonwealth may be required to pay a person just compensation for harm to that person's property: when the Commonwealth "takes" the property; when the Commonwealth "injures" the property; or when the Commonwealth "destroys" the property. In construing Section 242, our highest court has expressly stated this section "allows compensation for injury or destruction of property unattended by an actual taking." *Wilder*, 84 S.W.2d at 39. Accordingly, if the Commonwealth, or a subset thereof, injures or destroys the property of another—even if the injury or destruction does not rise to the level of a taking—just compensation must be paid. *See* Ky. Const. § 242.

Here, if the Appellants successfully prove their homes were damaged or destroyed as a direct consequence of the construction of the new high school, the Board may be liable in damages. *Cochrane*, 397 S.W.2d at 156 ("The Commonwealth must respond in damages if the use of its land wrongfully causes injury to the lands of others."). To that end and to that extent, the Board's governmental immunity is waived.

We have carefully considered the Board's argument that under *Commonwealth, Natural Res. & Envtl. Prot. Cabinet v. Stearns Coal & Lumber Co.*, 678 S.W.2d 378 (Ky.1984), no taking has occurred since Stathers and Elkins retain possession of their respective properties. In *Stearns*, the Kentucky Supreme Court was confronted with the issue of whether a legislative enactment[9] which restricted the uses to which a property owner could make of its property resulted in a compen-

9. In *Stearns*, the legislation at issue was the Kentucky Wild Rivers Act, codified at KRS 146.210, *et seq.* Under the legislation, the Department of Natural Resources enacted administrative regulations that included land owned by Stearns within the Wild Rivers system. The result was that Stearns' proposed activities on the land, including clear-cutting of timber, construction of vacation and retirement homes, deep mining, strip mining, extension of railway system, oil and gas drilling, and new road construction, would be prohibited. 678 S.W.2d at 380.

sable taking. The holding is somewhat confusing since the trial court had held that a taking had occurred as of June 25, 1975. The court, however, rejected this holding as a matter of law, since it had held under an earlier, related case, *Commonwealth ex rel. Dep't for Natural Res. & Envtl. Prot. v. Stephens*, 539 S.W.2d 303, 307–08 (Ky.1976), that no violation of the Wild Rivers Act, and hence no taking, could occur until the stream area was designated. The stream area in question was not designated until July 22, 1976, three weeks after the court rendered its opinion in *Stephens*. Similarly, and since Stearns filed its action on May 25, 1976, approximately two months prior to the stream area designation, the Supreme Court held that "there was no enforcement which deprived Stearns of any valuable right. The only attempts at enforcement were totally thwarted by judicial intervention. Consequently, there was no taking." 678 S.W.2d at 381.

In *Stearns*, the court discussed the then-state of "taking" jurisprudence:

The question of a legal taking is crucial. A taking is generally defined as the entering upon private property and devoting it to public use so as to deprive the owner of all beneficial enjoyment. Private property shall not be taken without just compensation. *See* 26 Am. Jur.2d, *Eminent Domain*, § 157.

This case involves what is referred to in the law as a reverse, or inverse, condemnation. Inverse condemnation is the term applied to a suit against a government to recover the fair market value of property which has in effect been taken and appropriated by the activities of the government when no eminent domain proceedings are used. The United States Supreme Court has been unable to develop any definite guidelines for determining when the best interests of justice require compensation for property taken. *See Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). That court, however, has identified several factors which are relevant to ascertaining whether an act amounts to a taking. Such elements are (1) the economic impact of the law on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, (3) the "character" of the governmental action, that is whether the action is a physical invasion versus a public program adjusting the benefits and burdens of economic life to promote the common good, (4) what uses the regulation permits, (5) that the inclusion of the protected property was not arbitrary or unreasonable, and (6) that judicial review of the agency decision was available.

In Kentucky, the Wild Rivers Act, if it had been fully executed, could have been a taking. Stearns used the area for access and presuming a showing that the present access was inadequate, the company would have been cut off from the coal because no new roads could be built. No mining was allowed and Stearns was not permitted to clear-cut timber. These prohibitions would greatly interfere with the company's operation and impair its financial interests. The land had to remain practically untouched and in a primitive natural state. Here even though the law gave authority for such action by the state, there was no enforcement which deprived Stearns of any valuable right. The only attempts at enforcement were totally thwarted by judicial intervention. Consequently, there was no taking.

678 S.W.2d at 381.

One commentator, Professor Carolyn S. Bratt, has stated that "[a]lthough the

Court in dicta superficially discussed the current state of 'taking' jurisprudence, it avoided a substantive decision on the 'taking' issue raised by the Act." Bratt, *Property Law*, 73 Ky. L.J. 459, 476 (1984–85). By contrast, the situation in this case does not involve a regulatory taking, *per se*, but rather a "physical invasion" by means of blasting which causes damage to the plaintiffs' property. Thus, *Stearns Coal* is distinguishable on its facts.

In *Bader v. Jefferson County*, 274 Ky. 486, 119 S.W.2d 870 (1938), the court was confronted with the issue of "whether a county must compensate an abutting landowner where the State Highway Commission lowered the grade of a road and thereby merely impeded his ingress and egress, without taking any of his land or causing other resulting injury." The case thus addressed two issues: (1) whether compensation was owed; and (2), if so, which political entity was obligated to pay. Only the first issue bears on our case. The court in *Bader* unequivocally held:

> Under the emphatic provisions of sections 13 and 242 of the Constitution, requiring that compensation be made for the taking of private property for public use, we have held many times that though there was no actual taking in the sense of reducing to possession, if there was a physical invasion of the property or actual damage thereto, such as by causing subsidence through the weakening or destruction of lateral support, or the diversion of water, or flooding of property, the owner must be compensated.

274 Ky. at 488, 119 S.W.2d at 871.

Finally, the Board argues that this Court's decision in *South Woodford Water Dist. v. Byrd*, 352 S.W.3d 340 (Ky.App. 2011) supports its position that sovereign immunity bars Stathers' and Elkins' claim. That case, however, is factually distinguishable from this case in that the dam-

ages to Byrd's property resulted from the water district's failure to turn off service to a rental property. Those facts do not involve any governmental action that involves or implicates a public use, *e.g.*, the construction of a public high school. Thus, Byrd apparently made no claim under Ky. Const. § 13 or § 242.

Accordingly, we affirm the circuit court's June 7, 2010 order denying the Board's motion to dismiss on immunity grounds.

## V. *Conclusion*

Based on the foregoing analysis, as to the appeal of Appellants Stathers and Elkins, we reverse the Garrard Circuit Court's grant of summary judgment; as to the cross-appeal of Cross–Appellants Board, Branscum, and Elza, we affirm; we therefore remand this case for further proceedings consistent with this opinion.

ALL CONCUR.